[No. B008660. Second Dist., Div. Four. Sept. 5, 1985.]

CAMBRIA SPRING COMPANY, Plaintiff and Appellant, v.
CITY OF PICO RIVERA et al., Defendants and Respondents.

**Counsel**

Thomas G. Baggot for Plaintiff and Appellant.

Samuel Siegel, City Attorney, Simmons, Ritchie, Segal & Stark and Graham A. Ritchie for Defendants and Respondents.

**Opinion**

**ARGUELLES, J.**—Plaintiff and appellant, Cambria Spring Company (Cambria), has appealed from a judgment entered after trial before the court, sitting without a jury, in favor of defendants and respondents, the City of Pico Rivera and its redevelopment agency (Pico Rivera).

Cambria complains that it was damaged by unreasonable conduct and delays occurring after adoption on December 23, 1974, of a redevelopment plan for the Whittier Boulevard area of Pico Rivera, which included the

property on which Cambria operated a business manufacturing automotive and other springs. During the pendency of this action, Cambria filed chapter 11 bankruptcy proceedings and ceased its business operations, but it retained its real property.

## PROCEDURAL HISTORY

On June 22, 1982, Cambria filed a complaint for inverse condemnation and precondemnation damages. The complaint alleged that various delays and unreasonable conduct by Pico Rivera after adoption of a redevelopment plan had rendered unmarketable, and caused a diminution in value of Cambria's real property, which consisted of 5.58 acres of land zoned for industrial use and improved with six buildings.

On July 28, 1982, Pico Rivera demurred to the complaint, on the ground that it failed to state a cause of action, alleging that the complaint showed on its face that the adoption of the redevelopment plan and other alleged actions of the city were insufficient to give rise to liability for inverse condemnation, and that Health and Safety Code section 33399,[1] which provides a method for the property owner to demand that the redevelopment agency acquire its property, was Cambria's exclusive remedy.

On August 20, 1982, the court overruled the demurrer as to the inverse condemnation action, stating that "a legal issue trial will determine if Defendant's actions constitute more than mere planning or resulted in unreasonable delay or other harmful or offensive conduct proximately causing damage to Plaintiff," and found that section 33399 does not limit the property owner's constitutional right to proceed by inverse condemnation.[2]

Pico Rivera answered the complaint, and, after pretrial conference, an amended and supplemental complaint was filed, alleging that Cambria had begun chapter 11 proceedings on July 29, 1982, as a result of losses of rents, profits, and business goodwill resulting from Pico Rivera's redevelopment plan and delays in its implementation.

Pico Rivera moved to have the legal issues tried first, and if liability was found, then to have a trial on the question of damages. Accordingly, the court ordered the case tried in two phases, with the legal issues to be tried before the court, without a jury, and the issue of valuation and damages to be tried by a jury, if liability was found.

---

[1] All statutory references are to the Health and Safety Code, unless otherwise indicated.

[2] The court sustained the demurrer as to Cambria's cause of action under Government Code section 7267.6, which prohibits the city from forcing the property owner to bring an inverse condemnation action, and Cambria does not challenge that ruling on appeal.

Trial of the legal issues commenced on February 14, 1984. Counsel stipulated, for this phase of the trial only, that some damages were proximately caused by Pico Rivera's conduct. This stipulation was intended to allow the court to reach the issue of whether Pico Rivera's conduct had given rise to liability in inverse condemnation and to reserve the question of the actual amount of damages for the jury.

On February 27, 1984, the court announced an extensive intended decision, finding that Pico Rivera was not liable to Cambria for inverse condemnation damages.

A nine-page statement of decision was filed, and judgment for defendants was entered on April 5, 1984. This appeal followed.

FACTS

On December 23, 1974, Pico Rivera enacted city ordinance No. 530, adopting a redevelopment plan, drawn up and approved by its redevelopment agency, pursuant to this state's Community Redevelopment Law (§ 33000 et seq.) and known as the "Redevelopment Plan for the Whittier Boulevard Redevelopment Project."

The ordinance and the plan contained the following provisions material to this action:

*The Ordinance:*

"The condemnation of real property, as provided for in the Redevelopment Plan for the Whittier Boulevard Redevelopment Project is necessary to the execution of such Redevelopment Plan and adequate provisions have been made for payment for property to be acquired as provided by Law;

"The City Clerk is hereby directed to record with the County Recorder of Los Angeles County a description of the land within the Project Area and a statement that proceedings for the redevelopment of the Project Area have been instituted under the Community Redevelopment Law.

"The City Manager is hereby directed, for a period of two (2) years after the effective date of this ordinance, to advise all applicants for building permits within the Project Area that the site for which a building permit is sought for the construction of buildings or for other improvements is within a redevelopment project area."

*The Plan*:

"Agency may acquire all real property located in the Project Area . . . .

"It is in the public interest and is necessary in order to eliminate the conditions requiring redevelopment and in order to implement this Plan, for the power of eminent domain to be employed by the Agency to acquire real property in the Project Area.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"The Agency shall not acquire real property to be retained by an owner either as a conforming owner or pursuant to a participation agreement if the owner fully performs under the agreement. . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"The Agency shall extend reasonable preferences to persons who are engaged in business in the Project Area, to continue or re-enter in business within the redeveloped area if they meet the requirements prescribed in this Plan. . . .

"It is the intention of the Agency that many owners of parcels of industrial, commercial and other types of real property within the Project Area be allowed to participate in the redevelopment of the Project Area. . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Each participant not a conforming owner shall enter into a binding agreement with the Agency by which the participant agrees to rehabilitate, develop, or use the property in conformance with the Plan and to be subject to the provisions hereof. . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Upon the adoption of this Plan no permit shall be issued for the construction of any new building or any addition to an existing building in the Project Area until the application for such permit has been processed in the manner herein provided. Any permit that is issued hereunder must be for construction which conforms to the provisions of this Plan.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Except for the nondiscrimination and nonsegregation provisions, which shall run in perpetuity, the provisions of this Plan shall be effective and the provisions of other documents formulated pursuant to this Plan may be made effective for forty-five (45) years from the date of adoption of this Plan by the City Council of the City of Pico Rivera.

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"This Plan may be amended by means of the procedure established in the Redevelopment Law (see California Health & Safety Code Sections 33450 to 33458), as the same now exists or as hereafter amended, or by any other procedure hereafter established by law.

". . . . . . . . . . . . . . . . . . . . . . . . . ."

*Participation Procedure:*

"Each owner and business tenant interested in becoming a participant in the Whittier Boulevard Redevelopment Project must submit to the Agency a statement indicating such interest ('Statement of Interest') within One Hundred and Twenty (120) days after the adoption of an ordinance by the City Council of the City of Pico Rivera approving the Redevelopment Plan for the Whittier Boulevard Redevelopment Project. The Agency may disregard Statements of Interest submitted after said One Hundred and Twenty (120) days. . . ."

After passage of the ordinance, the following events occurred pursuant to the plan:

In December, 1974, a copy of the ordinance, containing a legal description of the property in the project area, including the Cambria property, was recorded with the county recorder.

In 1978, the agency issued and sold tax allocation bonds in the amount of $6.72 million, to finance the project, including the acquisition of land within the project boundaries.

By application dated August 18, 1980, Pico Rivera sought an urban development acquisition grant (UDAG) from the federal Department of Housing and Urban Development (HUD) for $4,372,000, to fund a 45-acre light industrial and business park as part of the redevelopment project, to begin February 1, 1981. Cambria's property was within this area.

In November 1980, Pico Rivera entered into a disposition and development agreement with Lewis Properties, Inc. (developer) to redevelop this

industrial park. The agreement expressly provided that it was contingent on receipt of the UDAG, which by that time, had been sought in the increased amount of $7,725,028. The agreement could be terminated by either party if the UDAG was not obtained within six months.

When Pico Rivera first obtained preliminary approval of a UDAG for $4,519,700, it was made contingent on Pico Rivera increasing its contributions from $772,000 to $2,597,070. The city council was concerned about getting the additional funds. Also, the developer raised numerous objections to the terms of the grant. Even after the grant was renegotiated, the developer and its financiers were not satisfied. Finally, the disposition and development agreement was terminated before the trial of this case.

The original UDAG application and disposition and development agreement had scheduled acquisition of the Cambria property for September 1981; then, in the revised application, acquisition of the Cambria property was scheduled for the second quarter of 1982, and, during further attempts at funding, the acquisition date was changed several more times, to the third quarter of 1983.

In January 1984, the disposition and development agreement with the developer was terminated and, at the time of trial, Pico Rivera was still seeking a new developer. Without a developer, it was impossible to obtain a UDAG.

It was stipulated that several appraisals were made of the Cambria property and others. The record reflects that these appraisals were made while Pico Rivera was preparing its UDAG grant applications and revisions, and working with the developer to attempt to arrange for development.

The parties further stipulated that there was widespread publicity concerning the redevelopment project in Pico Rivera between 1974 and 1984.

William Lenihan, a real estate salesman with whom Cambria listed its property for sale in late 1980, testified at trial that he discussed the property with Dudley Lang, an assistant city manager of Pico Rivera. Mr. Lang explained to Mr. Lenihan that redevelopment was contingent on getting a UDAG; that Cambria could sell its property; and that only the Pico Rivera Building Officer had authority to grant or deny building permits. Mr. Lang testified that there had been no application for a building permit on the Cambria property.

Ray Hernandez, a licensed real estate broker, testified that he also talked with Mr. Lang about the Cambria property and was told that it was in a

redevelopment project area and that if the UDAG came through and Pico Rivera proceeded with redevelopment, a purchaser would have to reach an agreement with the developer. However, if redevelopment did not proceed, the situation would be otherwise.

DISCUSSION

We must now determine whether this series of events gave rise to liability for damages for inverse condemnation.

There are two procedural devices for enforcing the constitutional right to "just compensation" for the taking or damaging of private property for public use. (See Cal. Const., art. I, § 19.) In an eminent domain proceeding, the public authority initiates proceedings to take private property by condemnation for just compensation, to be determined in the proceeding. In an inverse condemnation action, the property owner initiates an action to obtain just compensation from the public authority for at least a partial taking or damaging of property. The Constitution requires "just compensation" in either case, measured by the property's "market value." (*Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39, 43-44 [104 Cal.Rptr. 1, 500 P.2d 1345].)

■ In the leading case of *Klopping* v. *City of Whittier, supra,* 8 Cal.3d 39, 51-52, the court held that certain announcements by a public entity of intent to condemn property, which result in a decline in the market value of the property prior to institution of condemnation proceedings, may give rise to damages in an inverse condemnation action, despite the lack of a condemnation proceeding instituted by the public entity. However, the court further held that "to allow recovery under all circumstances for decreases in the market value caused by precondemnation announcements might deter public agencies from announcing sufficiently in advance their intention to condemn. The salutary by-products of such publicity have been recognized by this court (*Merced Irrigation Dist.* v. *Woolstenhulme* [(1971) 4 Cal.3d 478] at p. 496, fn. 9 [93 Cal.Rptr. 833, 483 P.2d 1]); . . . a reasonable interval of time between an announcement of intent and the issuance of the summons serves the public interest. [T]o insure meaningful public input into condemnation decisions, *it may be necessary for the condemnee to bear slight incidental loss.* ■ However, when the condemner acts *unreasonably* in issuing precondemnation statements, either by excessively *delaying* eminent domain action or by other *oppressive* conduct, our constitutional concern over property rights requires that the owner be compensated. . . . even though the activities which give rise to such damages may be significantly less than those which would constitute a de facto taking . . . . [¶] [A] condemnee must be provided with an opportunity to demonstrate that

(1) the public authority acted improperly either by *unreasonably* delaying eminent domain action *following an announcement of intent to condemn* or by *other unreasonable conduct* prior to condemnation . . . ." (Italics added; fn. omitted.) (The property must also show damages proximately caused by the unreasonable delay or unreasonable conduct. However, here the parties stipulated that such damages had occurred.)

The *Klopping* case did not define what constitutes an announcement of intent to condemn property, from which unreasonable delay can be measured. However, in *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110 [109 Cal.Rptr. 799, 514 P.2d 111], the court held that adoption of a general plan for development of the area, pursuant to Government Code section 65300 et seq., revealing a proposed street extension through plaintiff's property, did not amount to a "taking" of private property entitling plaintiff to maintain an action for inverse condemnation. ■ The court further held that, "The adoption of a general plan is several leagues short of a firm declaration of an intention to condemn property. . . . In order to state a cause of action for inverse condemnation, there must be an invasion or an appropriation of some valuable property right which the landowner possesses and the invasion or appropriation must *directly* and *specially* affect the landowner to his injury." (At pp. 119-120; italics added.)

The *Selby Realty* court put forth the following reasons for requiring direct and special interference with plaintiff's property: "If a governmental entity and its responsible officials were held subject to a claim for inverse condemnation merely because a parcel of land was designated for potential public use on one of these several authorized plans, the process of community planning would either grind to a halt, or deteriorate to publication of vacuous generalizations regarding the future use of land. We indulge in no hyperbole to suggest that if every landowner whose property might be affected at some vague and distant future time by any of these legislatively permissible plans was entitled to bring an action in declaratory relief to obtain a judicial declaration as to the validity and potential effect of the plan upon his land, the courts of this state would be inundated with futile litigation. It is clear, under all the circumstances, that plaintiff has not stated a cause of action against the county defendants for either declaratory relief or inverse condemnation." (At pp. 120-121.)

■ In *Toso* v. *City of Santa Barbara* (1980) 101 Cal.App.3d 934, 952-957 [162 Cal.Rptr. 210], the court further clarified what is required for unreasonable precondemnation activities to give rise to damages in inverse condemnation. First, in the absence of a *formal resolution of condemnation* regarding the plaintiff's property, "the conduct of the public agency in

question must have evolved to the point where its conduct does result in *special* and *direct interference* with plaintiff's property." (At p. 956.) The court reiterated the holding of *People* ex rel. *Dept. Pub. Works* v. *Penninsula Enterprises, Inc.* (1979) 91 Cal.App.3d 332, 355 [153 Cal.Rptr. 895], that, " '[T]he widespread impact resulting from mere general planning is noncompensable.' " Thus as a prerequisite for damages for inverse condemnation, there must be "a formal resolution of condemnation *or some other official action towards the acquisition of plaintiff's property." (Toso* v. *City of Santa Barbara, supra,* 101 Cal.App.3d at p. 957; italics added.)

 In *Taper* v. *City of Long Beach* (1982) 129 Cal.App.3d 590, 612 [181 Cal.Rptr. 169], the court reviewed the developing case law and summarized some actions which have been found not to constitute an official expression of intent to acquire: "It is, of course, true that general land use planning, feasibility studies and even the adoption of a general plan indicating potential use of privately owned property does not amount to inverse condemnation. (*Selby Realty Co.* v. *City of San Buenaventura, supra,* 10 Cal.3d at p. 119; *Rancho La Costa* v. *County of San Diego* (1980) 111 Cal.App.3d 54, 60-61 [168 Cal.Rptr. 491], cert. den. (1981) 451 U.S. 939 [68 L.Ed.2d 326, 101 S.Ct. 2020]; *Briggs* v. *State of California* ex rel. *Dept. Parks & Recreation* [1979] 98 Cal.App.3d [190] at pp. 203-207 [159 Cal.Rptr. 390].) Undoubtedly, good faith negotiation by a municipality for the purchase of private property over a period of time reasonable in the circumstances would likewise not give rise to a cause of action for inverse condemnation. Nor does calling a bond election and urging passage for the purpose of securing funds for the acquisition of private property in appropriate circumstances amount to unreasonable conduct giving rise to a cause of action in inverse condemnation. (*Toso* v. *City of Santa Barbara, supra,* 101 Cal.App.3d at pp. 952-953; *Briggs* v. *State of California* ex rel. *Dept. Parks & Recreation, supra,* 98 Cal.App.3d at p. 207; *City of Walnut Creek* v. *Leadership Housing Systems, Inc.* (1977) 73 Cal.App.3d 611, 621-623 [140 Cal.Rptr. 690].) The same is true in the absence of official action to acquire private property when there is merely public discussion, debate and statements advocating public acquisition of a property. (*Toso* v. *City of Santa Barbara, supra,* 101 Cal.App.3d at p. 953.)"

In *Selby Realty Co.* v. *City of San Buenaventura, supra,* 10 Cal.3d 110, 119-120, the court considered that a general plan may be amended or abandoned, in reaching the conclusion that the adoption of such a plan does not, by itself, give rise to damages in inverse condemnation.

In *Smith* v. *State of California* (1975) 50 Cal.App.3d 529, 534-535 [123 Cal.Rptr. 745], the court held that property owners could not recover damages for inverse condemnation where the state announced only that it in-

tended to construct a freeway along a tentative route; where further action was required, such as consultation with communities, assessment of traffic needs, funding, revisions of the plan, and impact studies; and where implementation remained uncertain. The court found that substantial time is necessarily required before a freeway plan is implemented, and that even though diminution in market value may occur before implementation, imposition of liability for inverse condemnation every time a freeway plan was announced would add inordinate costs to every project. Therefore, where the state has not acted unreasonably or capriciously, and has followed orderly procedures, no liability attaches.

By contrast, in *People* ex rel. *Dept. Pub. Wks.* v. *Peninsula Enterprises, Inc.* (1979) 91 Cal.App.3d 332, 353-356 [153 Cal.Rptr. 895], the court upheld the selection of a date six months after the condemner entered into a "freeway agreement" as the date from which unreasonable delay could be measured, where the "freeway agreement" was only the culmination of actions by the condemner which had been directly and specially focused on the particular property for some time before the agreement was executed. The condemner's activities included an offer to purchase the property, supporting the trial court's conclusion that by the time the "freeway agreement" was executed, the condemner's activities had gone beyond the planning stage and into the acquiring stage.

■ "The underlying consideration in an inverse condemnation action is the proper balance between the owner's private property rights and the public need for proper land use and fiscal planning and control." (*Taper* v. *City of Long Beach, supra,* 129 Cal.App.3d 590, 604.)

Whether Pico Rivera's actions gave rise to a constitutional right to damages for inverse condemnation must be considered in light of this state's Community Redevelopment Law (§ 33000 et seq.). Redevelopment involves the replanning and reconstruction of blighted areas in the interest of the general welfare of a community. (See §§ 33020, 33030, 33031.) Blighted areas are those characterized by deterioration and disuse, inadequate streets and open spaces, and loss of productive uses, so that a serious social and economic burden is created. (§§ 33032, 33034.) The Legislature has expressly found that such blighted areas cause injury to the public health, safety and welfare, and that to protect the general welfare, the power of eminent domain should be used to acquire properties. (§§ 33035-33037.)

A community must comply with the procedures set forth in the Community Redevelopment Law before any area is designated for redevelopment. (§ 33300.) Ordinarily, the planning commission must first adopt a general plan for the community. (§ 33302.) The planning commission and the local

legislative body then designate a "project area," which must be a blighted area where redevelopment is necessary. (§§ 33320.1, 33321.)

The planning commission then prepares a preliminary plan showing the boundaries of the area and proposed development. (§§ 33324, 33325.) The redevelopment agency approves a "redevelopment plan" for the project area, conforming to the general plan, after holding hearings and conducting investigations. (§§ 33330, 33331.) The redevelopment plan must show the boundaries of the project area; the properties to be redeveloped; and the intended uses of the properties. (§§ 33332, 33333.)

After notice to property owners and public hearings, the local agency approves the redevelopment plan. (§§ 33350, 33357.) After further hearings, the local legislative body then adopts the plan by ordinance. (§ 33365.) This ordinance must contain legislative findings that the condemnation of real property is necessary to the plan and that provisions have been made to pay for it, and that the redevelopment plan would promote the public peace, safety, health and welfare. (§ 33367.) The plan must also include a declaration that the legislative body intends to carry out the plan. (§ 33370.)

Once the time for direct judicial review has passed (see §§ 33500-33501), it is conclusively presumed that the project area is a blighted area. (§ 33368.)

The adopted plan must be recorded with the county recorder and must include a description of the properties included. (§ 33373.) For two years after adoption of the plan, all applicants for building permits must be advised that the site is within a redevelopment project area. (§ 33374.)

An agency may acquire property within the project area by purchase or eminent domain. (§ 33391.) Before a redevelopment agency may condemn property, it must follow the condemnation procedures outlined in the Eminent Domain Law (Code Civ. Proc., § 1230.010 et seq.), including adoption of a "resolution of necessity" regarding the particular property to be acquired. (See Code Civ. Proc., §§ 1245.220-1245.250.)

■ Code of Civil Procedure section 1245.260, subdivision (a) (former Code Civ. Proc., § 1243.1) recognizes that an eminent domain action often is not filed within six months after a resolution of necessity to condemn and allows the property owner to compel condemnation of the property or recover damages. Thus, the statute contemplates that an actual resolution of intent to condemn may interfere with property values. (*Klopping* v. *City of Whittier, supra,* 8 Cal.3d 39, 57.)

Section 33398 of the Community Redevelopment Law expressly provides that Code of Civil Procedure section 1245.260 does *not* apply to an ordinance adopting a redevelopment plan, but *does* apply to a resolution of necessity to condemn adopted by a redevelopment agency with respect to a *particular parcel* of property.

Section 33399, effective in 1977, provides as follows: "(a) If a public entity has adopted a redevelopment plan but has not commenced an eminent domain proceeding to acquire any particular parcel of property subject to eminent domain thereunder within *three years* after the date of *adoption of the plan,* the owner or owners of the entire fee at any time thereafter may offer in writing to sell the property to the agency for its fair market value. If the agency does not, within 18 months from the date of receipt of the original offer, acquire or institute eminent domain proceedings to acquire the property, the property owner or owners may file an action against the agency in inverse condemnation to recover damages from the agency for any interference with the possession and use of the real property resulting from the plan, provided that this section shall not be construed as establishing or creating a presumption to any right to damages or relief solely by reason of the failure of the agency to acquire the property within the time set forth in this section. [¶] . . . . [¶] (f) In lieu of bringing an action under subdivision (a) or if the limitations period provided in subdivision (b) has run, the property owner may obtain a writ of mandate to compel the public entity, within such time as the court deems appropriate, to declare the property acquisition exempt or to commence an eminent domain proceeding to acquire the property. [¶] . . . . [¶] (h) With respect to redevelopment projects for which a final redevelopment plan has been adopted prior to January 1, 1977, the three year period provided for in subdivision (a) shall begin as of January 1, 1977." (Italics added.)

 In reviewing the judgment herein, we must determine whether Pico Rivera's adoption of the redevelopment plan constituted an "announcement of intent to condemn," within the meaning of the *Klopping* opinion; whether there was other official action focused particularly on acquiring plaintiff's property; and, if so, whether unreasonable delay followed; or if not, whether Pico Rivera engaged in other unreasonable conduct.

Cambria contends that the following acts of Pico Rivera constituted announcements of intent to condemn followed by unreasonable delay, or unreasonable conduct:

(1) December 23, 1974, city ordinance No. 530 adopting the redevelopment project.

(2) December 26, 1974, recordation of ordinance No. 530 with the county recorder.

(3) May 1978, issuance and sale of bonds to finance the project.

(4) August 18, 1980, application to H.U.D. for a UDAG.

(5) November 1980, disposition and development agreement.

(6) 1984 bond issue of $5.2 million authorized for this redevelopment project.

(7) September 30, 1981, date set in UDAG application to acquire Cambria's property, but changed four times, with the last change to "third quarter 1983."

(8) Pico Rivera never put any funds into acquiring property.

(9) Throughout 1982, correspondence and activities aimed at appraising Cambria's real property and business.

(10) From 1974 to 1984, widespread publicity concerning the project.

(11) April 1981, conversations between Cambria's real estate salesman and broker, and Mr. Lang.

In finding that there was no announcement of intention to acquire, the trial court found that adoption of the redevelopment plan did not constitute such an announcement, because the plan did not state or require that all the property would be acquired by the agency, but only that the property was "subject to condemnation" (see § 33391), which is always true of private property. All the actions of Pico Rivera complained of by Cambria constituted only general planning, public debates, and other general activity not particularly focused on Cambria's property, and, therefore, did not give rise to damages.

The court further found that Cambria did not apply for, and was not denied, a building permit, and that Mr. Lang, who was not a person empowered to bind Pico Rivera on its intent to acquire the property, did not, in any event, make any announcements about Pico Rivera's intent to acquire the property.

Therefore, the court found that Pico Rivera took no official action showing an intent to acquire Cambria's property in particular, so that the pre-

requisite for the constitutional right to damages under *Klopping* did not exist.

The court also found that there was no unreasonable precondemnation conduct; that Pico Rivera's refusal of the UDAG was based on the developer's failure to comply with conditions of the grant; that Pico Rivera used its best efforts to secure a developer for the project; that it was reasonable for Pico Rivera not to have spent any funds acquiring properties; and that none of the alleged unreasonable actions were particularly focused, in any event, on Cambria's property.

 We must affirm the trial court's findings. First, we have determined that none of the actions enumerated by Cambria constituted an announcement of intent to condemn. In reaching this conclusion, we have considered the criteria set forth in *Klopping* and its progeny and the Community Redevelopment Law.

The adoption of a redevelopment plan closely resembles the general planning which, in the opinions discussed above, has been held not to constitute an announcement of intent to condemn. The adoption of a redevelopment plan goes further than the adoption of a general plan (Gov. Code § 65300 et seq.). As held in *Selby Realty Company* v. *City of San Buenaventura, supra,* 10 Cal.3d 110, the adoption of a general plan does not amount to an announcement of intent to condemn, and a general plan is a prerequisite to a redevelopment plan (§ 33302). However, the adoption of a redevelopment plan still falls "several leagues short of a firm declaration of an intention to condemn property." (*Selby Realty Company* v. *City of San Buenaventura, supra,* 10 Cal.3d at p. 119.) This is so because the redevelopment plan still does not provide the "special and direct interference with plaintiff's property" required by *Selby Realty.* (See *Toso* v. *City of Santa Barbara, supra,* 101 Cal.App.3d 934, 956.) Moreover, a redevelopment plan, like a general plan, may be amended (§ 33450) before plaintiff's property is taken. (See *Selby Realty Company* v. *City of San Buenaventura, supra,* 10 Cal.3d 110, 119-120.) The plan itself provides that it is to remain in effect for 45 years, and that the city may redevelop all or part of the area. Thus, adoption of a redevelopment plan does not have the finality required to give rise to liability for damages.

Of great importance in reaching this conclusion is the concern for the public welfare expressed in *Selby Realty.* In adopting a redevelopment plan, Pico Rivera necessarily determined that it was for the general welfare and public health and safety to redevelop the project area, of which the Cambria property was but a small part. (See § 33367.) As the *Selby Realty* court

noted, imposition of liability for damages in inverse condemnation upon adoption of a community plan would cause the process of beneficial community planning to grind to a halt, or "would add inordinate costs to every project." (See *Smith* v. *State of California, supra,* 50 Cal.App.3d 529, 534-535.)

Recordation of the redevelopment plan, sale of bonds, and application for a UDAG, likewise did not amount to an announcement of intent to condemn. These activities, and the publicity concerning the project, lacked the requisite special and direct focus on Cambria's property. The appraisals of property were undertaken in connection with obtaining the UDAG and were not directed at an immediate taking of the Cambria property.

As there was no official action amounting to an announcement of intent to condemn, there could be no liability based upon unreasonable delay following such an announcement. The evidence was substantial and convincing that Pico Rivera's activities never went beyond the planning stage, and did not reach the "acquiring stage." (Cf. *People* ex rel. *Dept. Pub. Wks.* v. *Peninsula Enterprise, Inc., supra,* 91 Cal.App.3d at pp. 353-354.)

██ ██ Moreover, whether there has been unreasonable delay or unreasonable action by the condemner is a question of fact. (*Klopping* v. *City of Whittier, supra,* 8 Cal.3d 39, 55.) This issue was tried before the court, and the court's findings are entitled to be upheld if supported by substantial evidence.

Pico Rivera's actions reasonably reflect good faith attempts to obtain funding and a developer willing to complete its redevelopment project. There is no indication in the record of official activity aimed at depressing the value of Cambria's property so that it could be acquired more easily, or of other oppressive conduct. Troubles with the developer's and the financier's acceptance of the UDAG's terms led to Pico Rivera's final inability to obtain the needed funding. There was substantial evidence in the record, regarding Pico Rivera's attempts to obtain funding, to support the trial court's finding that Pico Rivera's actions were not unreasonable.

Although Cambria was not entitled to damages under the *constitutional* theory enunciated in *Klopping,* the facts of this case indicate that Cambria had a remedy specifically provided by the Legislature, pursuant to section 33399. That section provides remedial relief for the property owner, which, in this case, is more favorable than what the Constitution would require. It creates a right to compensation *additional* to the constitutional right enunciated in *Klopping.*

Cambria has also sought relief pursuant to that section. The statute provides that where a redevelopment plan has been adopted before 1977, the

three-year period for the public entity to commence condemnation proceedings begins as of January 1, 1977. Since Pico Rivera adopted its plan in 1974, Cambria could have commenced proceedings under the statute as of January 1, 1980. However, Cambria did not avail itself of this remedy until March 23, 1984. Under the facts of this case, the Constitution does not require that Cambria be given relief beyond that provided by the statute.

### DISPOSITION

The judgment is affirmed.

McClosky, Acting P. J., and Nelson, J.,* concurred.

A petition for a rehearing was denied September 27, 1985, and appellant's petition for review by the Supreme Court was denied December 18, 1985.

---

*Assigned by the Chairperson of the Judicial Council.