[Nos. C036592, C037212. Third Dist. July 30, 2002.]

CITY OF RIPON, Plaintiff and Appellant, v.
MARSHALL C. SWEETIN et al., Defendants and Respondents.

888

**COUNSEL**

Herum Crabtree Dyer Zolezzi & Terpstra, Herum Crabtree Brown, Thomas H. Terpstra; Freeman, D'Aiuto, Pierce & Gurev, Freeman, D'Aiuto, Pierce, Gurev & Keeling, Maxwell M. Freeman, Ronald J. D'Aiuto and Thomas H. Keeling for Plaintiff and Appellant.

Cassel Malm Fagundes and Joseph H. Fagundes for Defendants and Respondents.

OPINION

**SIMS, Acting P. J.**—The dispute in these consolidated appeals involves (1) valuation of property taken in eminent domain for a highway interchange project, and (2) litigation costs. Plaintiff City of Ripon (City) valued the property at $190,000, with light industrial use being the "highest and best use" of the property. The property owners, defendants Marshall C. Sweetin and Billie A. Sweetin, asserted the value was $356,000, based on "highway commercial" use being the "highest and best" use to which the property was reasonably adaptable. Over the City's objection, the trial court allowed defendants to introduce evidence before the jury of the City's allegedly unreasonable precondemnation conduct to support the defense theory that but for the project, defendants' property would have access to public utility services which would have made highway commercial use of the property economically feasible. The jury returned a verdict adopting the defense valuation of $356,000. Judgment was entered, and the trial court awarded litigation costs to defendants under Code of Civil Procedure section 1250.410.[1]

In case No. C036592, the City appeals from the judgment, arguing the trial court's refusal to exclude inadmissible evidence of precondemnation activities was erroneous and prejudicial. In related case No. C037212, the City appeals from the trial court's award of litigation costs to defendants.

We shall conclude the trial court erroneously admitted evidence before the jury of the City's allegedly unreasonable precondemnation conduct. We shall therefore reverse the judgment and the order awarding litigation costs.

FACTUAL AND PROCEDURAL BACKGROUND

The subject property is a 0.60-acre triangular-shaped parcel of real property located along the south side of State Highway 99 (which runs east-west at that location), with access via Moffat Boulevard in Ripon. Defendants rented the property in 1986 with an option to buy and bought the property in 1989. On the November 25, 1998, valuation date, the property was zoned M-1, meaning it could be used for "light industrial" purposes or, upon receipt of a discretionary use permit, it could also be used for highway commercial purposes. On the valuation date, the property contained a residence where defendants lived and a garage from which they operated an automobile repair business. Neighboring properties on the south side of the highway were being used for light industrial purposes. There was commercial development on the other side of the highway.

---

[1]Undesignated statutory references are to the Code of Civil Procedure.

On November 25, 1998, the City filed an eminent domain complaint to acquire by condemnation a fee simple interest in defendants' property. The complaint alleged the property was being taken "for the construction of certain on and off ramp improvements to the Jack Tone/Highway 99 interchange." City Resolution No. 98-75, passed on September 15, 1998 (Resolution), stated the City "is engaged in a project to construct the Jack Tone Road interchange, which will provide necessary access and services to properties in the northern areas of the City" (the subject property is south of Highway 99, which runs east-west at that location) and "in order to complete the Jack Tone Road interchange construction project, it will be necessary to acquire certain fee simple interests in real property in order to construct, improve, operate, repair, inspect, and maintain the Jack Tone Road interchange . . . ."

Defendants' answer to the complaint opposed condemnation and asserted, among other things, that defendants claimed "pre-condemnation damages and/or diminution in the value of Defendants['] property resulting from an unreasonable delay in commencing the eminent domain proceedings and/or other oppressive conduct after prior announcements and actions by Plaintiff made clear it's [*sic*] intentions to acquire Defendants' property. As a proximate result of the unreasonable and oppressive conduct and activities of Plaintiff in the course of Plaintiff's efforts to acquire the property, Defendants have been unable to fully use and enjoy the property, Defendants['] property has suffered a loss in value, the market ability [*sic*] of Defendants' property has been severely impaired and[] income from Defendants' property has been lost and otherwise unnecessary expenses relating to Defendants' property have been incurred by the Defendants."

In June 2000, the City filed a motion to bifurcate the issue of precondemnation damages and specially set for court trial the foundational matter of whether the City was *liable* for precondemnation damages due to unreasonable precondemnation conduct by the City, under *Klopping v. City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345] (*Klopping*).

Defendants did not oppose bifurcation, and the trial court set an August 2000 date for defendants to present evidence to the court proving entitlement to precondemnation damages.

Meanwhile, the City filed a trial brief containing a motion in limine to exclude at trial any reference to alleged precondemnation damages because, among other points, (1) section 1263.330, subdivision (c) excludes from fair market value any decrease in property value attributable to the City's

preliminary actions relating to the taking,[2] and (2) case law allowing a public entity to be liable for unreasonable precondemnation conduct—*Klopping, supra*, 8 Cal.3d 39—requires a judicial determination of unreasonable governmental conduct before any such evidence can go to the jury.

Defendants filed opposition to the in limine motion and filed their own trial brief asserting, "The sole issue in this bifurcated action is the effect of the CITY's precondemnation activities on the highest and best use of [defendants'] highly visible and accessible property. Defendants do not so much seek precondemnation damages as much as they assert that the CITY's precondemnation activity affected the marketability of the subject property for its highest and best use as a fast food restaurant or other highway commercial use."

A court hearing was held on August 14, 2000, during which both the *Klopping* matter and the in limine motion were resolved. At that hearing, defense counsel stated defendants had stipulated they were not asking for *Klopping* damages, *but* with the qualification that defendants did *not* stipulate that the precondemnation evidence had no relevance. Since defendants withdrew their *Klopping* claim, there was no need for a court finding on the threshold question of entitlement. With respect to admissibility of precondemnation evidence despite withdrawal of the *Klopping* claim, the defense argued evidence of the City's precondemnation activity was relevant and admissible at the jury trial on the question of valuation of the property, to show the effect the activity had on the "highest and best use" of the property.

Under defendants' theory, the City prevented the property from ever achieving its highest and best use, because the City knew as far back as 1988 (when it adopted a general plan) that it would ultimately do a Jack Tone Road interchange project. In 1991, the City annexed various parcels, including defendants' parcel, which was previously outside the City's limits.[3] In 1994, the City constructed the Jack Tone Infrastructure Project to provide city water and sewer service to properties on the *other* side of Highway 99. In connection with the 1994 project, the City acquired an easement to run pipelines across defendants' property. Defendants believed their property would also be hooked up to these public utility pipelines, but the City did not do so, apparently because the City knew it would later take defendants' property for the interchange project.

---

[2] Section 1263.330 provides in relevant part: "The fair market value of the property taken shall not include any increase or decrease in the value of the property that is attributable to any of the following: [¶] . . . [¶]

"(c) Any preliminary actions of the plaintiff relating to the taking of the property."

[3] On appeal, defendants cite trial testimony that the annexation "was to be developed for highway type commercial" uses. However, defendants' selective quote omits the end of the sentence, in which the witness added "and light and heavy industrial uses."

The defense asserted the evidence concerning the 1988 general plan and the 1994 infrastructure project involved "evidentiary issues that ultimately affect the value of the property because they affect who the jury's going to believe about what the highest and best use of this property could be versus why it never was developed that way and why today there isn't a Burger King or Taco Bell or Del Taco or KFC or anything else on that property even though there's no other fast food development along that stretch of 99 . . . ."

The City responded that defendants were making an artificial distinction, and there was no real difference between defendants' theory and *Klopping* damages. The City said defendants were merely trying to go "through the back door" in order to avoid "jumping through the hoops" required by *Klopping*. The City also argued the evidence was obviously intended to inflame the jury.

The court agreed with defendants and ruled "any evidence that adversely affected the highest and best use is going to be admissible even if it might have the secondary effect of showing the activity of the City prior to the starting of the project. If it affects the highest and best use, and most of your initial arguments criticized the argument of [defense expert] Duncan, well that goes to the weight of his testimony not the admissibility of his testimony."

The case proceeded to a jury trial on August 15, 2000, on the sole question of valuation. We have granted the City's unopposed request for judicial notice (dated Aug. 20, 2001) of an affidavit by City counsel Thomas Keeling, attesting the trial court granted his request for a continuing objection to any evidence of the City's precondemnation activity.

In the jury trial, defense expert James Duncan testified (consistent with the matters discussed at the hearing) that the property's highest and best use as of its valuation date, November 25, 1998, was "highway commercial," yielding a fair market value of $356,000.

Duncan agreed that highway commercial use required public utilities, i.e., city water and sewer service, which defendants' property lacked, and that (as of the valuation date) it would not be economically feasible for defendants' property to meet this requirement, unless the City had hooked up defendants' property (or allowed access for future hookup) to the pipelines installed during the 1994 infrastructure project (which provided city utilities to the Flying J and other businesses on the other side of the highway).

Duncan believed the property was never used for highway commercial purposes because the City knew since 1988 that it planned to take the

property for the interchange project. But for the interchange project, opined Duncan, the City would have cooperated fully to develop this and neighboring sites as commercial property in order to obtain the sales tax revenue. But for the interchange project, opined Duncan, the City would have provided for defendants' property to be hooked up to the utility lines installed in the 1994 infrastructure project, and thus highway commercial use would be feasible on the November 1998 valuation date.

Examples of Duncan's testimony are as follows:

"[T]he subject property has been basically under threat, if not actual, it was really under threat of condemnation since 1988. So for about ten years, the property owners could not really do anything with their property because the City of Ripon had a couple of different projects but they were always planning to use those projects for a freeway project. . . . [¶] . . . [¶]

"Now, and my feeling is that had this not been always a thought of—for the last ten years by the City as a[n] overpass project, that they would have cooperated fully to develop this site and the neighboring sites, they would have wanted them to be upgraded. They would have wanted the sales tax revenue from a fully developed property and they would have done everything possible to help the owners develop these sites. And so in that term, my feeling was that it would have been legally permissible. [¶] . . . [¶]

"[T]here are right on the back of the subject property, there are—there is an easement and there are sewer lines, storm drain lines, and water line, right, part of the subject property.

"Now, if these properties were going to be developed, if the City had ever thought that were going to be developed, I believe they would have set up some attachment for all the property along Moffat Road so that they could hook in all of them. And with that, the subject property is really adjacent to all public utilities there. . . .

"Now, the City of Ripon has informed us that our property owners can't hook in. My belief is the only reason they can't hook in is what was poor planning. Why it wasn't important—it was—just wasn't planned by the City of Ripon because they knew these properties were never going to be allowed to develop but that should not penalize the owner.

"The way I looked at it, these properties have utilities, Sweetin property has utilities right adjacent and that would have allowed them to hook up had the City not thought that this was going to be an overpass project and just had forgotten to do anything for the Sweetin property."

The City's appraiser, David Giomi, explained various reasons why highway commercial use of the property was not feasible on the valuation date of November 25, 1998, and the highest and best use of the property on its valuation date was light industrial use, yielding a fair market value of $190,000. Giomi indicated the Department of Transportation (Caltrans) would be opposed to a commercial use that would increase traffic at that location, but he admitted in cross-examination that similar opposition had been overcome in respect to other property.

The trial court gave the following jury instruction, at the City's request and over defense objection:

"In determining the fair market value of the property, you may not include any change caused by the proposed improvement that is the use which the plaintiff is to make of the property.

"You may not include any change in value because of any preliminary action of the plaintiff relating to the taking of the property such as planning activities, annexation of land by the City, or the 1994 Jack Tone Road Infrastructure Project.

"In determining fair market value, you must disregard any decrease in market value caused by the likelihood that it would be acquired for the public improvement."

The jury returned a verdict that defendants were entitled to just compensation of $356,000, and judgment was entered.

Defendants moved for an award of litigation costs, including attorney fees, under section 1250.410. The trial court granted the motion and awarded $42,217 for attorney fees and $13,986.43 for (other) litigation costs, plus interest.

The City appeals from the judgment and the cost award.

DISCUSSION

The City asserts the trial court erroneously refused to exclude evidence of the City's allegedly unreasonable precondemnation conduct under section 1263.330, subdivision (c). (See fn. 2, *ante*.) ▇▇▇ The City also argues, as it did in the trial court, that the trial court erroneously allowed the jury to hear such evidence even though the City's liability for such precondemnation conduct must be determined by a court, not a jury. Because we agree with the City's latter argument—that this evidence should not have been adduced before the jury—we need not construe section 1263.330.

We begin with *Klopping, supra,* 8 Cal.3d 39. There, the City of Whittier initiated condemnation proceedings to take Klopping's and Sarff's properties in November 1965. In July 1966, the City of Whittier adopted a resolution that it would not continue the condemnation proceeding but would reinstate proceedings in the future when certain litigation was terminated. The condemnation proceedings were abandoned in November 1966.

In July 1967, Klopping and Sarff sued the City of Whittier on a theory of inverse condemnation, asserting their rights under what is now article I, section 19 of the California Constitution, which provides in relevant part, "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner."

The trial court sustained a demurrer without leave to amend and the plaintiffs appealed. Our Supreme Court said: "[W]e hold that a condemnee must be provided with an opportunity to demonstrate that (1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn *or by other unreasonable conduct prior to condemnation*; and (2) as a result of such action the property in question suffered a diminution in market value." (*Klopping, supra,* 8 Cal.3d at p. 52, fn. omitted, italics added.)

The court continued, "Here plaintiffs seek to prove at trial the fair market value of their properties was diminished because of the precondemnation statements issued by defendant City [of Whittier]. Specifically they allege that they were unable to fully use their properties and suffered a loss of rental income. It has long been established that rent is an appropriate criterion for measuring fair market value. [Citation.]" (*Klopping, supra,* 8 Cal.3d 39, 53, fn. omitted.)

The court reversed the judgment as to plaintiff Sarff, allowing him to try to prove loss of rental income on remand. (*Klopping, supra,* 8 Cal.3d 39, 58-59.) However, as to plaintiff Klopping, the Supreme Court affirmed. (*Id.* at p. 59.) This was because Klopping's land was taken in a second condemnation action, which had proceeded to judgment, and Klopping could have claimed his damages from precondemnation conduct of the City of Whittier in the trial of the second eminent domain suit. (*Id.* at p. 58.)

Although the opinion in *Klopping* ultimately approved loss of rental value as a measure of damages, it is important to note that the *Klopping* court did so only because, in that instance, loss of rental was an approved method of measuring *a decline in market value.* (*Klopping, supra,* 8 Cal.3d 39, 53.)

"The *Klopping* opinion thus emphasizes that damages in such a situation must be measured in terms of increasing or decreasing market values to the property involved." (*City of Los Angeles v. Property Owners* (1982) 138 Cal.App.3d 114, 120 [187 Cal.Rptr. 667].) "The basic measure of damages in inverse condemnation actions, as in all eminent domain proceedings, is 'market value.'" (*Tilem v. City of Los Angeles* (1983) 142 Cal.App.3d 694, 707 [191 Cal.Rptr. 229]; see also *Taper v. City of Long Beach* (1982) 129 Cal.App.3d 590, 610 [181 Cal.Rptr. 169].)

With this in mind, it is apparent that defendants' claim in this litigation was a classic *Klopping* claim, as they had originally averred in their answer, to wit, that the City acted unreasonably in not hooking up defendants' property to utilities installed in 1994 because the City knew it wanted to take the property for the interchange project. This conduct depressed the market value of the property because it prevented the property from achieving its highest and best use as "highway commercial" property.

██ However, as *Klopping* itself makes clear, a public entity is liable for a diminution of market value caused by its precondemnation conduct only where it has acted *improperly and unreasonably*. (*Klopping, supra,* 8 Cal.3d 39, 51-52; see *Contra Costa Water Dist. v. Vaquero Farms, Inc.* (1997) 58 Cal.App.4th 883, 897 [68 Cal.Rptr.2d 272].) Whether the public entity has acted unreasonably is a question of fact. (*City and County of San Francisco v. Golden Gate Heights Investments* (1993) 14 Cal.App.4th 1203, 1212 [18 Cal.Rptr.2d 467]; *Cambria Spring Co. v. City of Pico Rivera* (1985) 171 Cal.App.3d 1080, 1098 [217 Cal.Rptr. 772].) "However, the threshold question of liability for unreasonable precondemnation conduct is to be determined by the court, with the issue of the *amount* of damages to be thereafter submitted to the jury only upon a sufficient showing of liability by the condemnee. [Citation.]" (*Redevelopment Agency v. Contra Costa Theatre, Inc.* (1982) 135 Cal.App.3d 73, 79 [185 Cal.Rptr. 159]; see *People v. Ricciardi* (1943) 23 Cal.2d 390, 402 [144 P.2d 799]; *Marshall v. Department of Water & Power* (1990) 219 Cal.App.3d 1124, 1139-1141 [268 Cal.Rptr. 559].) Because inverse condemnation damages for precondemnation conduct must be claimed in a pending eminent domain action (*Klopping, supra,* at p. 58; *Taper v. City of Long Beach, supra,* 129 Cal.App.3d 590, 610), the appropriate procedure is to bifurcate the trial of the action so that the question of the liability of the public entity is first adjudicated by the court without a jury. (See *Contra Costa Water Dist. v. Vaquero Farms, Inc., supra,* at p. 896; *Redevelopment Agency v. Contra Costa Theatre, Inc., supra,* at p. 80.) As we have noted, the City obtained such a bifurcation in this case. If liability for unlawful precondemnation conduct is not established by the court, the court should exclude evidence of alleged resulting damages from

the jury. (See *Redevelopment Agency v. Contra Costa Theatre, Inc., supra*, at p. 80.)

 It was error for the trial court to allow evidence of the City's allegedly unreasonable precondemnation conduct and of a depression of market value based thereon, to go to the jury without first determining the question of the City's liability, particularly in light of the fact the defendants stipulated they were not asking for *Klopping* damages. We agree with the following argument in the City's brief: "The distinction upon which the court based its denial of City's motion to exclude evidence of City's precondemnation conduct was illusory. The purpose and effect of [defendants'] introduction of such evidence at trial was clearly to demonstrate that City's precondemnation activities depressed the value of the [s]ubject [p]roperty over a long period of time by discouraging its development as a highway commercial site. If [defendants] believed they could carry their burden of proof on that issue, they could have—and should have—pursued their claims for precondemnation damages. They did not do so, and they did not submit the issue of entitlement of precondemnation damages to the court for a decision thereon, as they would have been required to do."

Nor can we agree with defendants and the trial court that the evidence of the City's allegedly unreasonable precondemnation conduct was admissible on the theory it was probative of the "highest and best use" of defendant's parcel.

 Our Supreme Court has recently explained the concept of "highest and best use" of property as follows: "In striking [a] balance between the public's need and the owner's loss, our Legislature has provided that the measure of compensation for property taken pursuant to the government's powers of eminent domain is its 'fair market value.' (Code Civ. Proc., § 1263.310.) It has defined 'fair market value' as 'the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, *each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available.*' (§ 1263.320, italics added.)

"As section 1263.320 indicates, the fair market value of property taken has not been limited to the value of the property as used at the time of the taking, but has long taken into account the 'highest and most profitable use to which the property might be put in the reasonably near future, to the extent that the probability of such a prospective use affects the market

value.' (*People* ex rel. *State Public Works Bd.* v. *Talleur* (1978) 79 Cal.App.3d 690, 695 [145 Cal.Rptr. 150]; *Redevelopment Agency* v. *Contra Costa Theatre, Inc.*[, *supra,*] 135 Cal.App.3d 73, 83 . . . ; see also *People* v. *Ocean Shore Railroad* (1948) 32 Cal.2d 406, 425-426 [196 P.2d 570, 6 A.L.R.2d 1179] . . . ['the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not as the measure of value, but to the extent that the prospect of such use affects the market value of the land . . . .'].)" (*City of San Diego v. Neumann* (1993) 6 Cal.4th 738, 744 [25 Cal.Rptr.2d 480, 863 P.2d 725].)

 It is apparent that the "highest and best use" of property is simply an ingredient of market value. An argument that unreasonable precondemnation conduct has prevented the parcel from obtaining its "highest and best use" is therefore simply an argument that the precondemnation conduct has decreased the market value of the property—a claim that comes squarely within *Klopping*'s rationale. While we give defendant's attorney high marks for legal inventiveness, we do not agree that the question whether the City acted unreasonably can be shifted from judge to jury by use of this device.

Moreover, we also note that the evidence of the City's allegedly unreasonable precondemnation conduct was not relevant to show the "highest and best use" of the property as that term is properly understood. A determination of highest and best use asks about the use to which the property might be put *in the reasonably near future.* (*City of San Diego v. Neumann, supra,* 6 Cal.4th 783, 744; see also *City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 867 [135 Cal.Rptr. 647, 558 P.2d 545] [where due to zoning restrictions the condemned property is not presently available for use to which it is otherwise geographically and economically adaptable, the condemnee is entitled to show a reasonable probability of a zoning change *in the near future* and thus to establish such use as the highest and best use of the property].) But that was simply not the import of defendants' evidence. They did not try to prove that the property would probably be put to "highway commercial" use in the reasonably near future; rather, their evidence purported to show that unreasonable precondemnation conduct of the City had prevented the subject property from being used for "highway commercial" purposes.

Thus, to pick but two important examples, defendants' expert, Duncan, acknowledged that if the property were to be developed as highway commercial, it would require public water, public sewer, storm drains, and gutters. Duncan did not testify that it was reasonably probable that these improvements would be furnished to the property in the near future. Rather,

he testified, "Now, the City of Ripon has informed us that our property owners can't hook in [to the aforementioned utilities]. My belief is the only reason they can't hook in is what was poor planning. Why it wasn't important—it was—just wasn't planned by the City of Ripon because they knew these properties were never going to be allowed to develop but that should not penalize the owner."

In another instance, Duncan was asked whether highway commercial use would be legally permissible. He acknowledged that such use would require a use permit from the City, a fact that was confirmed by the City's director of planning and economic development, Ernest Tyhurst. Yet Duncan did not testify that the City was likely to issue a use permit in the near future. (Compare *Redevelopment Agency v. Contra Costa Theatre, Inc., supra,* 135 Cal.App.3d 73, 85-86 [evidence properly admitted that a use permit would issue in the near future].) Duncan acknowledged the City had probably received no applications for commercial development of the subject property between 1988 and 1998. (Director of Planning Tyhurst testified the City had not received an application for a project on the subject property.) Duncan did not ask the City whether any applications for commercial development of the subject property (or of other properties on the south side of Highway 99) had ever been received. Thus, in testifying that "highway commercial" use of the subject property was "legally permissible," Duncan said, "Now, and my feeling is that had this not been always a thought of—for the last ten years by the City as a[n] overpass project, that they would have cooperated fully to develop this site and the neighboring sites, they would have wanted them to be upgraded. They would have wanted the sales tax revenue from a fully developed property and they would have done everything possible to help the owners develop these sites. And so in that term, my feeling was that it would have been legally permissible."

This is not testimony that it was reasonably likely the subject property could be developed for "highway commercial" use in the near future. Rather, it is testimony that the City's unreasonable precondemnation conduct prevented such development. We have been cited no California case, nor are we aware of any, that has approved the admission of such evidence in a direct condemnation case on the ground that it is relevant to show the "highest and best use" of the property.

■ "Broadly speaking, an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence. [Citations.] Speaking more particularly, it examines for abuse of discretion a decision on admissibility that turns on the relevance of the evidence in question. [Citations.] That is because it so examines the underlying determination as to relevance itself. [Citations.] Evidence is relevant if

it has any tendency in reason to prove a disputed material fact. (Evid. Code, § 210.)" (*People v. Waidla* (2000) 22 Cal.4th 690, 717-718 [94 Cal.Rptr.2d 396, 996 P.2d 46].) As we have recounted, evidence of the City's past alleged unreasonable conduct did not tend to show that future use of the property for "highway commercial" purposes was reasonably likely in the reasonably near future. Admission of the evidence was error. The erroneous admission of this evidence allowed the jury to adjudicate a question that should have been adjudicated by the court—whether the City's precondemnation conduct was unreasonable—assuming that the issue was not waived.

██ We must determine whether the erroneous admission of this evidence was prejudicial in light of the trial court's instruction to the jury telling them not to include any change in value because of any preliminary action of the City relating to the taking of the property such as planning activities, annexation of land by the City, or the 1994 Jack Tone Road infrastructure project, and telling the jury to disregard any decrease in market value caused by the likelihood that the property would be acquired for public improvement.

██ The ordinary rule is that the jury is presumed to follow the court's instructions on damages. (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 953 [160 Cal.Rptr. 141, 603 P.2d 58].) However, the rule is not inflexible and may be disregarded where it is clear from the record that the jury failed to follow an instruction. (See, e.g., *Crowe v. Sacks* (1955) 44 Cal.2d 590, 598 [283 P.2d 689]; *Ramona Manor Convalescent Hospital v. Care Enterprises* (1986) 177 Cal.App.3d 1120, 1138-1139 [225 Cal.Rptr. 120] (opn. of Kaufman, Acting P. J.).) ██ This is such a case. The jury would not have adopted expert Duncan's precise estimate of value—$356,000—unless it endorsed his opinion. And yet, as we have seen, that opinion depended, in several crucial respects, on Duncan's testimony that the City's unreasonable precondemnation activities prevented the subject parcel from achieving its "highest and best use" or its proper market value. We think that notwithstanding the trial court's instruction, the trial court's erroneous admission of the City's allegedly unreasonable precondemnation conduct doubtless affected the jury's computation of the fair market value of the property.

As indicated, defendants at the August 14, 2000, hearing stipulated they were not asking for *Klopping* damages. Therefore, they were not entitled to any adjudication, even by the court, concerning allegedly unreasonable precondemnation conduct by the City.

We conclude it is reasonably probable the City would have obtained a more favorable result in the absence of the challenged evidence, and the

erroneous admission of the evidence constitutes a miscarriage of justice that requires reversal of the judgment. (Cal. Const., art. VI, § 13; *Hrnjak v. Graymar, Inc.* (1971) 4 Cal.3d 725, 734 [94 Cal.Rptr. 623, 484 P.2d 599, 47 A.L.R.3d 224].) This result necessarily requires the reversal of the order awarding litigation costs to defendants.

In a petition for rehearing, defendants contend their property was entitled to city water and sewer services pursuant to the 1994 utility easement they signed allowing the City to run pipelines across their property, because the easement described their property as having city water and sewer services. However, no such description appeared in the grant of easement. The easement did refer to the City's Resolution to acquire the easement, and the Resolution had an attachment, "Exhibit A," which stated under "Site Description" that the property "lacks curbs, gutters, and sidewalks, and is currently zoned M-1, industrial by the City of Ripon. [¶] *Utilities include* electricity, telephone, natural gas, *city water, and sewer.*" (Italics added.) However, the same Exhibit A stated under "Description of Part Taken" that "This acquisition will be beneath the ground and apparently *none of the improvements or present operation will be affected.*" (Italics added.) Moreover, the Resolution itself stated the purpose of the acquisition was "to install certain infrastructure along Jack Tone Road which will provide necessary services to properties *in the northern areas of the city . . . .*" (Italics added.) As indicated, defendants' property was to the south of the highway.

Thus, the easement did not unequivocally entitle defendants' property to city water and sewer services, and it is undisputed that defendants' property was not hooked up to the city water and sewer services. Defendants' argument about the easement is one that would need to have been presented in a *Klopping* claim for unreasonable precondemnation conduct by the City.

### DISPOSITION

The judgment and order awarding litigation costs are reversed. The parties shall bear their own costs on appeal.

Nicholson, J., and Kolkey, J., concurred.

A petition for a rehearing was denied August 26, 2002, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied November 26, 2002.