[No. A027075. First Dist., Div. Three. Oct. 16, 1987.]

COMMUNITY CAUSE, Plaintiff and Appellant, v.
DANIEL E. BOATWRIGHT, Defendant and Respondent.

**COUNSEL**

Stephen C. Williams, David N. Bortin and Stephen H. Cornet for Plaintiff and Appellant.

Bryce C. Anderson for Defendant and Respondent.

**OPINION**

**SCOTT, J.**—This is the second appeal in plaintiff's action against defendant Daniel Boatwright, which alleged numerous violations of the Political Reform Act of 1974 (Gov. Code, § 81000 et seq.;[1] hereafter the PRA), among other causes of action. Plaintiff Community Cause is a nonprofit corporation located in Contra Costa County; defendant, now a state senator, was a state assemblyman representing part of that county when plaintiff sued. Defendant's demurrer was sustained without leave to amend and the action dismissed. In a published opinion, this court affirmed in part but reversed as to several causes of action. (*Community Cause* v. *Boatwright* (1981) 124 Cal.App.3d 888 [177 Cal.Rptr. 657].) A court trial was held to determine whether defendant violated the PRA by intentionally or negligently failing to report (1) an interest in a partnership known as Countrywood Shopping Center Associates (Countrywood) in statements of economic interest filed under the PRA before December 1976; and (2) certain

---

[1] Unless otherwise indicated, all statutory references are to the Government Code.

alleged income in his December 1976 statement of economic interest. Judgment was entered in favor of defendant, who was also awarded attorney fees and costs. We conclude that the award of fees and costs must be reversed, but otherwise affirm.

### THE FACTS AND THE LAWSUIT

a. *The facts*

Viewed in the light most favorable to the judgment, the evidence was as follows. In October 1973, Anthony Ujdur acquired an option to purchase approximately 17 acres located near the intersection of Treat Boulevard and Bancroft Road in Contra Costa County. The property was zoned agricultural and designated as single family residential on the county's general plan, and previous applications for its commercial development had been denied.

Ujdur's acquisition of the option was financed by Ujdur himself and several others: Ygnacio Homes, Inc. (Ujdur's corporation), Anthony Menosse, Joseph Ancona, and Anthony or Ila Shelton. In a written agreement dated October 16, 1973, Ujdur assigned the option to the following, in the share amounts indicated: Ancona, six-sixteenths; Ygnacio Homes, Inc., one-sixteenth; Anthony and Zita Ujdur, four-sixteenths; Forest Simoni, three-sixteenths; Anthony Menosse, one-sixteenth; and Ila Shelton, one-sixteenth. In the fall of 1974, the property was rezoned to permit commercial development.

In December 1974, a written agreement was made between "Countrywood Shopping Center Associates, a partnership, as owners," and Hoffman Construction Company, in which Hoffman agreed to assist in obtaining financing for a shopping center on the Treat Boulevard property and to construct the center. The agreement was signed by Ancona, Anthony Ujdur, Menosse, Simoni, and Arthur Shelton for the partnership. Kenneth Hoffman, president of the construction company, was to receive one share of an owner's interest in Countrywood. Hoffman also agreed to loan the partnership nearly $700,000 to enable them to exercise the option and begin development. Ancona and Ujdur signed a promissory note in that amount on behalf of Countrywood. As security, Hoffman required a deed of trust on the property and a personal guarantee of repayment by each partner; guarantees were signed by Ujdur, Ancona, Simoni, Menosse, and Ila Shelton.

In January 1975, Ancona, Ujdur, Simoni, Menosse, Ila Shelton, and Ygnacio Homes, Inc., by Ujdur, signed a written partnership agreement. It stated that the partnership had been operating under an oral agreement since October 1973, and specified the partnership interest of each consistent with their written agreement of October 1973. The agreement provided that

no partner should sell or assign his or her interest, except that Ujdur could dispose of one share and Ancona of two, within five years.

In February 1975, a partnership statement was recorded as required by Corporations Code section 15010.5. Listed as "all the partners of Countrywood Shopping Center Associates" were Ancona, Ujdur, Simoni, Ila Shelton, and Ygnacio Homes, Inc. Each listed partner signed the statement and a declaration under penalty of perjury that the statement was true. The partnership agreement was amended as of June 8, 1976, to add Hoffman as holder of a one-seventeenth share.

Relations among the partners, and in particular between Ancona and Ujdur, were strained almost from the beginning of their association. In July 1975, Ujdur was removed as managing partner. In December 1975, Ancona offered to sell two of his shares to defendant. Defendant refused the offer because he did not want to become partners with Ujdur. In mid-1976, he changed his mind. He purchased a two-year option on the shares, paying Ancona $24,000, which was to be applied to the purchase price if the option was exercised. The option agreement did not specify the purchase price, but according to Ancona, he promised to sell to defendant at his (Ancona's) cost, $12,000 per share, unless he had to spend additional money before defendant exercised the option.

Defendant, a lawyer as well as a legislator, had long been a friend of Ancona. When the shopping center project was first discussed at meetings in 1973, Ancona asked defendant to attend with him, because he knew other attorneys would be present. Defendant also attended meetings of the investor group in 1974. Although defendant was not practicing law in 1974 and was only closing out his files, he did perform some services which benefited the partnership. He drafted the partnership agreement at the request of Ancona; Shelton, who was also an attorney, reviewed and finalized it. Defendant also participated in negotiations with the two principal tenants for the shopping center, Safeway and Longs Drug Store, and negotiated with Hoffman concerning his agreement with and loan to the partnership. Defendant did not bill Ancona or the partnership for any of these services; he felt obligated to Ancona because of a prior transaction with him in which defendant had realized substantially more profit than anticipated. There was no understanding that defendant would acquire a financial interest in Countrywood for any of his work.

In October 1976, Ujdur, Simoni and Menosse, who together had a majority interest in the partnership, joined forces and voted to give themselves as a management committee the authority to sell, lease, or dispose of the property. As a result, Ancona, Hoffman and Shelton filed an action seeking a dissolution of the partnership and other relief.

Despite the animosity among the partners, in November 1976 defendant decided to exercise his option, primarily because his family circumstances at the time made him feel a need to provide for his children. Ancona did not charge defendant any more than his cost for the exercise of the option because the partnership dissolution was pending at the time, and Hoffman was seeking money for cost overruns from the partners; Ancona believed those factors adversely affected the value of the shares.

b. *The litigation*

As we discussed in *Community Cause* v. *Boatwright, supra,* 124 Cal.App.3d at page 898, the PRA requires specified public officials to make periodic disclosures of investments, interests in real property, and income. (§§ 87200-87210.) At the time of this action, section 82030, subdivision (a), of the PRA defined income as "income of any nature from any source, including . . . any . . . gift, [or] discount in the price of anything of value . . . ." Section 82028 defined gift as "any payment to the extent that consideration of equal or greater value is not received . . . ."[2]

In his December 1976 statement of economic interest, defendant reported acquisition on June 30, 1976, of an option to purchase a partnership interest in Countrywood, and valued the option as in excess of $100,000, the highest value listed on the disclosure schedule; he also reported the exercise of that option on November 15, 1976, and valued the partnership interest as in excess of $100,000.

Section 91004 of the PRA authorizes the Fair Political Practices Commission (the Commission) or a local resident to bring a civil action for damages against one who intentionally or negligently violates its provisions.[3] In 1978, after exhausting its administrative remedies under the PRA (see § 91007; *Community Cause* v. *Boatwright, supra,* 124 Cal.App.3d at

---

[2] In pertinent part, section 82030 now defines income as ". . . a payment received, including but not limited to any salary, wage, advance, dividend, interest, rent, proceeds from any sale, gift . . . ." Section 82028, subdivision (a), now defines gift as "any payment to the extent that consideration of equal or greater value is not received and includes a rebate or discount in the price of anything of value unless the rebate or discount is made in the regular course of business to members of the public without regard to official status. Any person, other than a defendant in a criminal action, who claims that a payment is not a gift by reason of receipt of consideration has the burden of proving that the consideration received is of equal or greater value."

[3] In pertinent part, section 91004 provides that any person who "intentionally or negligently violates any of the reporting requirements . . . shall be liable in a civil action brought by the civil prosecutor or by a person residing within the jurisdiction for an amount not more than the amount or value not properly reported." If a judgment is entered against the defendant in an action by a local resident under section 91004, the plaintiff receives 50 percent of the amount recovered, and the other 50 percent is to be deposited in the state's General Fund. (§ 91009.)

pp. 903-904), plaintiff filed the instant action. Among the causes of action which survived after plaintiff's first appeal, several alleged that defendant had actually acquired his partnership interest long before November 1976 and either negligently or intentionally failed to report that interest on his December 1975 and March 1976 statements. Other surviving causes of action alleged that there was a disparity between the $24,000 which defendant paid for the partnership interest and its value, and that defendant should have disclosed that disparity as income, because it was either a gift or a discount. (See *Community Cause* v. *Boatwright, supra,* 124 Cal.App.3d 888.) Plaintiff sought damages as authorized by section 91004 but not injunctive relief pursuant to section 91003.

After a court trial, the court issued a lengthy statement of decision summarizing the evidence, setting forth its findings, and explaining its conclusion that defendant was entitled to judgment. The court's findings and analysis will be discussed in more detail in conjunction with our evaluation of plaintiff's contentions.

## ACQUISITION OF THE COUNTRYWOOD INTEREST

As we have stated, plaintiff alleged that defendant acquired his interest in Countrywood before November 1976, and either negligently or intentionally failed to report that interest in his December 1975 and March 1976 statements of economic interest. Plaintiff repeats that allegation on appeal, but its arguments ignore the trial court's findings and the applicable standard of review.

■ In determining the sufficiency of the evidence to support a judgment, a reviewing court does not reweigh the evidence. Instead, it must resolve all conflicts in favor of the prevailing party and view the evidence in the light most favorable to that party. (*Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 398 [185 Cal.Rptr. 654, 650 P.2d 1171].) It must give the prevailing party the benefit of every reasonable inference from the evidence. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [122 Cal.Rptr. 79, 536 P.2d 479].) In other words, while the appellate court will examine all the evidence, it will consider only the evidence supporting the successful party, and will disregard the contrary showing. (*Campbell* v. *Southern Pacific Co.* (1978) 22 Cal.3d 51, 60 [148 Cal.Rptr. 596, 583 P.2d 121]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 282, pp. 293-294.)

Plaintiff's unfocused arguments about the timing of defendant's acquisition are an attempt to have this court reweigh the evidence and draw inferences which the trial court rejected. Based on what it described as the "overwhelming weight of the evidence," the trial court found that defendant first invested in Countrywood and became a partner in 1976. The

evidence, which we have already summarized in some detail, is ample to support the court's finding. In particular, we emphasize, as did the trial court, the mass of documentary evidence, including declarations *under oath by* Ujdur and other of plaintiff's own witnesses, that never included defendant as a partner until the exercise of his option in November 1976.

### FAILURE TO REPORT INCOME OR GIFT

Plaintiff urged at trial that defendant paid only $24,000 for his Countrywood partnership shares, that the shares were worth at least $200,000, and that defendant violated the PRA because he did not report the difference between those two amounts as income or a gift on his December 1976 statement of economic interest. Plaintiff repeats those allegations on appeal, but again, its arguments are unfocused. The trial court's decision in favor of defendant on the income reporting issue rested on alternative grounds: (1) defendant did not violate the PRA; or (2) if there was a violation, plaintiff was not entitled to damages because any violation was inadvertent rather than intentional or negligent. Plaintiff fails to discuss separately or even acknowledge these alternatives, but if the court's ruling was correct on either ground, it must be sustained on appeal. (See *Melendres* v. *City of Los Angeles* (1974) 40 Cal.App.3d 718, 728 [115 Cal.Rptr. 409].)

a. *No violation of the PRA*

■ We first consider the court's conclusion that defendant did not violate the PRA, a conclusion based on the court's several factual findings and on its understanding of the reporting requirements of the PRA.

Defendant testified that in addition to the cash price he paid for his Countrywood interest, he believed his share of an anticipated shortfall in construction money would be approximately $60,000 and his potential liability for attorney fees in the partnership dissolution action would be at least $25,000. The trial court found that defendant's $24,000 cash payment and those identifiable liabilities which he had assumed equalled a total consideration of at least $115,963. It also found, however, that uncertainties as to the partnership's liabilities and the extent to which defendant did or would have assumed his share of those liabilities made it impossible to determine with precision the amount of consideration paid.

As to the value of the shares, the trial court accepted the testimony of appraiser Noel Atkinson, which we will discuss in more detail later, that the value of each partnership share when defendant's option was exercised was at least $100,000, but it also concluded that the PRA does not require a public official to employ an appraiser to satisfy his or her financial disclosure obligations. More importantly, it found that *at the time defendant*

*exercised the option,* neither he nor anyone else could have determined the precise or even the approximate *actual value* of those shares.

 In applying the reporting requirements of the PRA to the facts found, the court formulated the following rule based on its understanding of the Commission's administrative interpretation of the PRA: "Where . . . a reasonable person in the position of the defendant does not know and cannot be expected to know whether or not he has received value in excess of amounts paid and liabilities assumed, or, if so, the amount of such difference, such person is not required to report a gift or other income." Stated another way, the trial court concluded that when a person who is subject to the reporting requirements of the PRA purchases a partnership interest in real property, if he or she knows or reasonably should have known that he or she has received value in excess of the consideration paid, which includes the liabilities assumed, and knows or reasonably should have known the amount of that excess value, he or she must report that difference, either as income or as a gift. We agree with that conclusion, and adopt it as our own.

 When the court measured the facts found against that rule of reasonableness, it concluded that given the uncertain amount of consideration paid for the shares and the difficulty in even estimating their actual value, there was no reasonable basis for determining what "income" defendant realized upon exercise of the option, if any; therefore, defendant did not violate any of the requirements of the PRA with respect to the reporting of income and/or gifts.

Although it is an appellant's burden first to show error and then to establish prejudice from error, plaintiff has neither specified the errors it apparently perceives in the trial court's analysis nor articulated the legal issues it wishes this court to consider. Plaintiff does not appear to disagree with the trial court's statement of the reporting requirements of the PRA. Instead, in what we understand as an attack on the reasonableness of defendant's conduct, plaintiff broadly contends that defendant was "chargeable with knowledge that the shares were worth many times what he paid for them."

Plaintiff's argument is based on the testimony of appraiser Noel Atkinson, who testified that he had appraised the fair market value of the proposed shopping center in May 1974 for the purposes of obtaining construction and take-out loans. In late 1976, when the shopping center was completed and many of its stores were leased, at Ujdur's request he again appraised the property and estimated its fair market value at between approximately $6.8 million and $8.4 million.

Atkinson acknowledged that in neither appraisal did he attempt to determine the fair market value of an individual partnership share. At trial, when asked by plaintiff to make that determination, he testified that he could give a "general estimate" of the late 1976 value of individual shares, but not their fair market value. As was apparent from his testimony, determining the value of an individual share, and in particular that of a minority share such as defendant purchased, was not simply a matter of dividing the fair market value of the whole by the number of shares. He explained that after calculating the equity of an individual shareholder, he would have to consider and attempt to quantify the unknowns or risk factors which might diminish the value of an individual share, such as the litigation pending between the partners, the resulting attorney fees, and the possible construction cost overruns. Whether a share belonged to a minority shareholder was a factor which might either increase or decrease its value. Asked if with the information available, he could at least arrive at a "minimum value," Atkinson was of the opinion that the shares could not be worth less than $100,000 each.

Plaintiff reasons that defendant could and should have referred to the Atkinson appraisals when preparing his 1976 statement. Had defendant done so, plaintiff seems to argue, defendant would have realized that his shares were worth far more than any consideration paid.

Plaintiff's argument ignores the nature of those appraisals. As we have discussed in some detail, neither the 1974 nor the 1976 appraisal valued individual shares. It was only at trial that Atkinson even tried to determine a "general estimate" of their value, and that estimate was to some extent conjecture. Neither the 1974 nor the 1976 appraisals standing alone would have enabled defendant to determine the fair market value of his shares. The trial court found that at the time defendant prepared his disclosure statement, neither he *nor anyone else* (i.e., including the appraiser) could have determined the precise or even the approximate actual value of those shares. The evidence is ample to support that finding, and plaintiff points to no evidence in the record which indicates otherwise.

To summarize, we conclude that the evidence amply supports the trial court's conclusions that there was no reasonable basis for determining whether defendant realized any income upon the exercise of his option and that under these circumstances, defendant did not violate the reporting requirements of the PRA.

b. *Inadvertence*

■ ■ ■ ■ As the alternative ground for its decision, the court found that even if defendant did violate any of the PRA's reporting

requirements, he did so inadvertently rather than intentionally or negligently, and that his statement of financial interest constituted a good faith effort to comply with the PRA.[4]

In an argument which seems directed at the finding that defendant acted in good faith, plaintiff challenges the court's findings with respect to the consideration paid by defendant for his shares, and, in particular, objects to the inclusion of liabilities assumed by defendant in calculating that consideration. Plaintiff argues that a new partner is liable for partnership obligations only to the extent they can be satisfied out of partnership property. That argument ignores the court's finding that as a practical matter, defendant had either to assume the prior debts or risk the total loss of his $24,000 investment. Plaintiff also argues that it is "unlikely" that the hazard of paying construction cost overruns to Hoffman figured in defendant's calculation of the value of his shares, but that contention is an attack on the credibility of the defendant. Evidence of the subjective belief of defendant was inherently probative of whether any violation was inadvertent, negligent, or deliberate. (See *Thirteen Committee* v. *Weinreb* (1985) 168 Cal.App.3d 528, 537 [214 Cal.Rptr. 297].) The trial court believed defendant, and this court will not reweigh the evidence. Plaintiff also argues that there were buy-out provisions in the partnership agreement which would have protected defendant from losing his investment, but overlooks the court's finding that the buy-out provision was not mandatory.

Plaintiff has not established any error in the proceedings below. The trial court found that even if defendant received more than he paid for his shares of Countrywood, any failure to declare that difference was inadvertent rather than intentional or negligent, and that he made a good faith effort to comply with the reporting requirements of the act. Given the uncertainties in the liabilities which defendant faced and the difficulty in determining the actual value of a minority share in the partnership at the time, the evidence supports the trial court's findings.

## ATTORNEY FEES

Section 91012 provides that the court may award to a plaintiff or defendant who prevails in an action under the PRA his or her costs of litigation, including reasonable attorney fees. In its statement of tentative decision, the court ordered that defendant should recover costs and reasonable attorney

---

[4] A person who only inadvertently violates the PRA is not liable for damages in a civil action. (§ 91004.) In its reply brief and at argument, plaintiff urged that in light of the court's alternative finding of an inadvertent violation, it should at least have granted an injunction pursuant to section 91003 to compel defendant to file a corrected statement of economic interest. Plaintiff did not seek injunctive relief at trial, however, and cannot raise the point for the first time on appeal.

fees, provided he file his cost bill pursuant to Code of Civil Procedure section 1033 and serve a noticed motion supported by declarations for his reasonable attorney fees "not later than 10 days after notice of entry of judgment." Notice of entry of judgment was served on April 16 and filed in the trial court on April 18, 1984. Plaintiff filed a notice of appeal from the judgment on April 24. On April 30, defendant filed its notice of motion for attorney fees. The court rejected plaintiff's argument that the motion was untimely, and awarded fees in the amount of $118,408 and costs.

■ First, we consider defendant's contention that the propriety of the attorney fee award is not properly before this court because plaintiff did not file a separate notice of appeal from the order determining the amount of fees. The contention is without merit. It is not the amount of the fee award which plaintiff challenges; rather, it is the court's initial determination that defendant was entitled to fees as a prevailing party. That determination first appeared in the court's statement of tentative decision and was incorporated into the judgment, and plaintiff appealed from that judgment in its entirety.

■ Plaintiff contends the trial court abused its discretion in awarding attorney fees, arguing that a prevailing defendant should be awarded fees under section 91012 only if the plaintiff's claim is frivolous, unreasonable, malicious, or clearly groundless.

On its face, section 91012 contains no such limitation, but *People* v. *Roger Hedgecock for Mayor Com.* (1986) 183 Cal.App.3d 810 [228 Cal.Rptr. 424], decided during the pendency of the instant appeal, supports plaintiff's interpretation of the statute. In *Hedgecock* the district attorney filed an action under the PRA alleging that defendants failed to report various campaign contributions. After the Commission filed a similar but more inclusive action, the district attorney's action was voluntarily dismissed, and defendants requested attorney fees. The trial court denied the request, on the ground that a voluntary dismissal did not make defendants prevailing parties within the meaning of the fee award statute. The appellate court found it unnecessary to decide that question. Instead, it held that a prevailing defendant in an action under the PRA could be awarded fees only if the plaintiff's suit was "frivolous, unreasonable or without foundation," and affirmed the denial of fees on that basis. (*Id.,* at p. 815.)

The *Hedgecock* court reasoned that the use of the word "may" in the attorney fee statute indicates legislative intent to retain judicial discretion in defining the circumstance in which fees will be awarded. (*Id.,* at p. 815.) To delineate the scope of that discretion with respect to prevailing defendants, the court relied heavily on *Christiansburg Garment Co.* v. *EEOC* (1978) 434 U.S. 412 [54 L.Ed.2d 648, 98 S.Ct. 694], in which the Supreme Court held that prevailing defendants in a title VII civil rights action are not entitled to

attorney fees unless a court finds that plaintiff's claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so. (*Id.,* at p. 422 [54 L.Ed.2d 648 at p. 657].)

The statute at issue in *Christiansburg* was similar to section 91012 in that it contained no limitation on a prevailing defendant's right to fees: "In any action or proceeding under this title the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee. . . ." (42 U.S.C. § 2000e-5(k).) Nevertheless, the Supreme Court rejected an argument that the plain meaning of the statute entitled a prevailing defendant to fees on the same basis as a prevailing plaintiff. Instead, it noted the discretionary language of the statute, and pointed out the factors favoring a fee award to a prevailing title VII plaintiff that are absent when defendant prevails. First, plaintiff in a civil rights action is the "chosen instrument of Congress to vindicate 'a policy that Congress considered of the highest priority.' " Second, an award of fees to a prevailing plaintiff is an award against a violator of federal law. (*Christiansburg, supra,* 434 U.S. at p. 418 [54 L.Ed.2d 648 at p. 655].) The Supreme Court also pointed out that a rule which routinely awarded fees to prevailing defendants ". . . could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success." (*Id.,* at p. 422 [54 L.Ed.2d 648 at p. 657].)

The *Hedgecock* court found the Supreme Court's analysis persuasive and concluded that the *Christiansburg* standard should be applied to a claim by a prevailing defendant for fees in an action under the PRA. (*People* v. *Roger Hedgecock for Mayor Com., supra,* 183 Cal.App.3d at pp. 816-817.) ▪ It noted that the primary purpose of section 91012 is to encourage private litigation enforcing the PRA. It then reasoned, "[T]he need to avoid discouraging potential plaintiffs under the [PRA] is perhaps even more critical than with respect to the federal civil rights statutes. Where a violation of civil rights has occurred, the injury, although usually noneconomic and often ephemeral, is at least direct. Where the actionable wrong is the adulteration of the political process, the damage to the citizenry is significant but the injury to any one citizen is not only nebulous but also indirect. The attorney's fee provisions of the [PRA] are designed to ameliorate the burden on the individual citizen who seeks to remedy what is essentially a collective wrong." (*Id.,* at p. 817.)[5] We agree with the *Hedgecock* court's interpretation of section 91012.

---

[5] In interpreting section 91012, another California court has also looked to federal authority. In *Thirteen Committee* v. *Weinreb, supra,* 168 Cal.App.3d 528, plaintiffs brought an action under the PRA to compel defendant to file an amended campaign statement disclosing certain expenditures. Although the trial court concluded that disclosure was required, it refused to award plaintiffs attorney fees, on the ground that defendant had acted in good faith. The appellate court reversed, holding that defendant's good faith was irrelevant to an award of fees. The court relied on several cases interpreting analogous federal statutes in which

Defendant argues that *Hedgecock* should not be followed, and relies instead on *Citizens for Oxnard* v. *Maron* (1983) 145 Cal.App.3d 702 [193 Cal.Rptr. 647]. In that case after a city council approved an environmental impact report on a redevelopment project, plaintiffs brought an action to enjoin one city council member from participating in decisions on the project because of an alleged conflict of interest, and to void the council's approval of the project. The demurrer of the defendant public official was sustained with leave to amend. Although the project had been abandoned, plaintiffs filed another complaint, seeking the same relief. A demurrer was sustained without leave to amend, and defendant was awarded costs and attorney fees. The appellate court affirmed. With respect to the fee award, it merely quoted the Black's Law Dictionary of a prevailing party and stated, "The defendants . . . were the prevailing parties and are therefore entitled to fees." (*Id.,* at p. 707.) Contrary to defendant's assertion, however, the case does not support the proposition that there are no limitations on the entitlement of a prevailing defendant to fees. That issue was apparently not raised by the parties and was not considered by the court, and cases are not authority for propositions not considered. (*Canales* v. *City of Alviso* (1970) 3 Cal.3d 118, 127-128, fn. 2 [89 Cal.Rptr. 601, 474 P.2d 417].) Furthermore, an argument can be made that the case is actually consistent with the *Christiansburg* standard. Plaintiffs' refusal to voluntarily dismiss their case even though it was moot might well support a determination that they had continued to litigate after their claim clearly became groundless or unreasonable. (See *Christiansburg Garment Co.* v. *EEOC, supra,* 434 U.S. at p. 422 [54 L.Ed.2d 648 at p. 657].)

We next consider whether remand is required because the court failed to apply the proper standard. In *People* v. *Roger Hedgecock for Mayor Com., supra,* 183 Cal.App.3d 810, the trial court had not applied the *Christiansburg* standard in denying attorney fees, but the appellate court found it unnecessary to remand in order to affirm. It took judicial notice of the outcome of a related criminal action involving several of the same defendants and the same underlying facts. The results of that action made it impossible to conclude that the plaintiff's civil action was frivolous, unreasonable, or groundless. (*Id.,* at pp. 817-818.)

In this case we have also concluded as a matter of law that plaintiff's action cannot be considered groundless or unreasonable. When it awarded fees, the trial court stated, "While it cannot be said that the action was wholly frivolous, a person of ordinary intelligence with competent legal

courts determined that because private litigation was an important enforcement method, successful plaintiffs were entitled to attorney fees "unless special circumstances would render an award unjust." (*Id.,* at p. 537, citing *Newman* v. *Piggie Park Enterprises* (1968) 390 U.S. 400 [19 L.Ed.2d 1263, 88 S.Ct. 964] and other cases.)

representation would have known that the likelihood of success was extremely remote." But the fact that a plaintiff is unlikely to succeed does not necessarily mean that his or her action is groundless. The Supreme Court in *Christiansburg* cautioned trial courts against concluding that because a plaintiff did not ultimately prevail, his or her action was unreasonable or without foundation; the court warned that this kind of "hindsight logic" could discourage all but the most airtight claims. (*Christiansburg Garment Co. v. EEOC, supra,* 434 U.S. at p. 422 [54 L.Ed.2d 648 at p. 657].) The resolution of plaintiff's claims in this case required the trial court to consider the novel question of how the reporting requirements of the PRA should be applied when there may be a disparity between the cash price paid for an asset and its actual value. While the court eventually concluded that plaintiff could not prevail because the consideration paid and value received were both too uncertain, it cannot be said that plaintiff's claim was unreasonable or groundless from the outset.

In light of our conclusion, we need not consider plaintiff's contention that the court had no jurisdiction to award attorney fees because defendant's motion for fees was untimely.

Insofar as the judgment awards costs and attorney fees, it is reversed, and the court is directed to enter an order denying defendant's request for attorney fees and costs. In all other respects, judgment is affirmed. Each party to bear its own costs.

White, P. J., and Barry-Deal, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 22, 1987.