[No. A055754. First Dist., Div. Three. Mar. 3, 1993.]

CITY AND COUNTY OF SAN FRANCISCO, Plaintiff and Respondent,
v.
GOLDEN GATE HEIGHTS INVESTMENTS, Defendant and Appellant.

COUNSEL

Grayson & Topsfield, Violet Elizabeth Grayson and P. Cecilia Storr for Defendant and Appellant.

Louise H. Renne, City Attorney, and Andrew W. Schwartz, Deputy City Attorney, for Plaintiff and Respondent.

OPINION

WHITE, P. J.—This is an eminent domain action brought by the City and County of San Francisco (City) to acquire a single lot owned by Golden Gate Heights Investments (GGHI). The property is a vacant, steep hillside in the Sunset neighborhood of the city. The property is known as the "Rock Outcropping" because it bears large and unique rock outcroppings visible from the Pacific Ocean. The City is acquiring the property to preserve it for open space. GGHI appeals from the judgment in condemnation, challenging the court's valuation of the property.

## FACTS

In 1986, GGHI purchased the subject property for $200,000. At the time of the purchase, both GGHI and the seller believed the property could be developed for residential use. The property was zoned R1, which meant it could be developed into 14 residential lots.

Immediately following the close of escrow, GGHI retained an architect and set up a meeting with the City Planning Department to discuss development of the property. During the meeting at the City Planning Department, it was discovered that the property inadvertently had been omitted from the City's open space map; GGHI was led to believe the City would not process an application to develop the property until the City determined whether it wanted to acquire the property.

On November 13, 1989, City's board of supervisors adopted a resolution of public interest and necessity to acquire the property for open space. On February 9, 1990, City filed this eminent domain action.

At trial, City maintained that, even in the absence of eminent domain proceedings, the planning commission would have required GGHI to devote to open space use, nine of the fourteen lots authorized under the planning code. Lucian Blazej, a city planner, testified that in February of 1987, GGHI was advised that even if the property could be developed, 14 lots on the property was unrealistic; only 5 lots could be developed. This was due to the natural features of the rocks, the fact there was natural foliage, and the virgin nature of the property. Dean Macris, director of planning for the City, stated that although there was no way to absolutely predict what the planning commission would do, he thought it unlikely the commission would approve development on more than five lots.

City produced two expert appraisal witnesses, John Clifford and Frank Mahoney, to testify to the value of the condemned property. Clifford valued the property at $535,000. Mahoney valued it at $500,000. GGHI's expert witness was Arthur Gimmy. Gimmy valued the property at $1,620,000.

The trial court found the subject property could not have been subdivided into more than five lots with a fair market value of $100,000 per lot. Accordingly, it valued the property at $500,000. The court also found there had been no unreasonable delay in commencing an eminent domain action which would justify precondemnation damages. This appeal followed.

DISCUSSION

*Planning Commission Approval*

■ GGHI contends the trial court erred by valuing the property based on speculation that City's planning commission could have required GGHI to dedicate nine out of fourteen possible lots to public use as open space. The contention is based on the premise that City's planning code authorizes 14 lots on the subject property. Citing *Lucas* v. *South Carolina Coastal Council* (1992) 505 U.S. __ [120 L.Ed.2d 798, 112 S.Ct. 2886] and *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141], GGHI maintains City could not require it to dedicate nine out of fourteen lots for open space without paying just compensation. GGHI misreads these cases.

In *Lucas*, the property owner purchased beachfront property prior to the adoption of a state statute prohibiting all development of the property. After passage of the new legislation, the property owner filed suit, contending that the legislation effected a taking of his property without just compensation. The trial court found the legislation deprived the property owner of any reasonable economic use of the property and rendered it valueless. The state Supreme Court reversed. The court ruled that when a regulation respecting the use of property is designed to prevent serious public harm, no compensation is owed under the takings clause. The United States Supreme Court disagreed, holding that "noxious-use logic cannot serve as a touchstone to distinguish regulatory 'takings'—which require compensation—from regulatory deprivations that do not require compensation." (*Lucas* v. *South Carolina Coastal Council, supra,* 505 U.S. __, __ [120 L.Ed.2d at pp. 819-820, 112 S.Ct. at p. 2899].)

However, the *Lucas* court acknowledged and reaffirmed its historical approach to governmental regulation of private property. The approach starts with the rule that, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." (*Penna. Coal Co.* v. *Mahon* (1922) 260 U.S. 393, 415 [67 L.Ed. 322, 325-326, 43 S.Ct. 158, 28 A.L.R. 1321].) Although the high court has avoided any set formula for determining how far is too far since *Mahon*, it has articulated at least two categories of regulatory action as compensable. The first encompasses regulations that compel the property owner to suffer a physical invasion of his or her property; the second is where regulations deny all economically beneficial or productive use of land. (*Lucas* v. *South Carolina Coastal Council, supra,* 505 U.S. __, __ [120 L.Ed.2d at pp. 812-813, 112 S.Ct. at p.

2893].) Since the trial court in *Lucas* determined that the South Carolina legislation had rendered the beachfront property valueless, the case falls within the second category.

In *Nollan*, the California Coastal Commission conditioned a beachfront building permit upon granting a public easement across the property. The Supreme Court held that if California wanted to advance its plan to provide public access to the ocean by using its power of eminent domain, the Fifth Amendment required the state to pay for it. (*Nollan* v. *California Coastal Comm'n, supra,* 483 U.S. at pp. 841-842 [97 L.Ed.2d at pp. 691-693].) *Nollan* involves a physical taking, rather than regulatory taking. (See *Yee* v. *City of Escondido, Cal.* (1992) 503 U.S. __, __ [118 L.Ed.2d 153, 167-168, 112 S.Ct. 1522, 1530]; *Blue Jeans Equities West* v. *City and County of San Francisco* (1992) 3 Cal.App.4th 164, 169 [4 Cal.Rptr.2d 114].) As such, it falls within the first category of regulatory which mandates compensation.

Both *Lucas* and *Nollan* can be distinguished from the case at bench. Unlike the facts in *Lucas*, GGHI's property would not have been rendered valueless had the planning commission permitted development of only five lots. Although GGHI purchased a single parcel of real estate which it intended to subdivide into 14 lots, restriction of the property to 5 lots would not have deprived GGHI of "any reasonable economic use" of the land. ██ " 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole . . . ." (*Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104, 130 [57 L.Ed.2d 631, 652, 98 S.Ct. 2646].) ██ Nor are the facts here similar to those in *Nollan*. The planning commission's denial of a 14-lot subdivision application would not have required GGHI to "submit to the physical occupation of [its] land." (*Yee* v. *City of Escondido, Cal., supra,* 503 U.S. __, __ [118 L.Ed.2d at pp. 167-168, 112 S.Ct. at p. 1530].)

*Comparable Sales*

At the commencement of trial, GGHI moved to exclude evidence of the prices paid by City for adjacent parcels which were acquired for use as open space. The court denied the motion without prejudice. GGHI renewed its objection at the time City introduced it at trial. ██ Citing Evidence Code

section 822, subdivision (a)(1),[1] GGHI now asserts the trial court erred by admitting and relying upon evidence of comparable sales consummated under the threat of eminent domain condemnation. The contention lacks merits.

Section 822, subdivision (a) states: "In an eminent domain or inverse condemnation proceeding, notwithstanding the provisions of Sections 814 to 821, inclusive, the following matter is inadmissible as evidence and shall not be taken into account as a basis for an opinion as to the value of property: [¶] (1) The price or other terms and circumstances of an acquisition of property or a property interest if the acquisition was for a public use for which the property could have been taken by eminent domain, *except that the price or other terms and circumstances of an acquisition of property appropriated to a public use or a property interest so appropriated shall not be excluded under this section if the acquisition was for the same public use for which the property could have been taken by eminent domain.*" (Italics supplied.) GGHI contends the above underscored exception, added by amendment in 1988 (see Stats. 1987, ch. 1278, § 1, p. 4548), applies only to condemnation of utility properties. (See Matteoni & Veit, Condemnation Practice in California (Cont.Ed.Bar Supp. 1992) § 9.49, p. 161.) We do not read the statute as so limited. Nor does GGHI's cited authority so state.

Moreover, even if we assume it was error to accept evidence of the sale of adjacent properties, there was no prejudice to GGHI. As the statement of decision makes clear, the trial court was greatly influenced by evidence of other comparables: "The City's appraisers also relied heavily on the sales of 368 and 352 San Marcos for $125,000 and $135,000 per lot respectively. These properties had lower development costs than the subject and are located in a superior neighborhood with superior views. A reasonable adjustment for these factors supports a value of $100,000 for the subject. Even the sale on which Mr. Gimmy heavily relies, Hawk Hill, indicated $110,000 per lot. An adjustment downward would be necessary for the subject property because the evidence indicated that Hawk Hill would have lower development costs than the subject."

*Prior Sale of Property*

■ GGHI contends it was error to admit evidence of GGHI's purchase price of the subject property in 1986. It maintains the purchase price was depressed due to 20 years of "condemnation blight," the sale was too old to use as a comparable and City's motivation was to prejudice the court against awarding an excessive profit by GGHI. We disagree.

---

[1] All further statutory references are to the Evidence Code unless otherwise indicated.

Evidence of the sale of the subject property is specifically admissible pursuant to section 815. Moreover, "evidence of other sales of the identical real property is admissible and . . . matters such as a change of value between the time of the sale and the time of the condemnation ordinarily go merely to the weight of the evidence and not to compel exclusion. [Citations.]" (*L. A. County Flood etc. Dist.* v. *McNulty* (1963) 59 Cal.2d 333, 337 [29 Cal.Rptr. 13, 379 P.2d 493].)

*Substantial Evidence*

 GGHI contends the trial court's valuation was not supported by substantial evidence. The contention is principally based on the fact that valuation was based on subdivision of the property into five rather than fourteen units. We have previously found that determination to be proper.

GGHI also criticizes the court's reliance on valuation of the San Marcos Street properties, its failure to discuss City's seven other comparables in its statement of decision, City's appraisers' subdivision ("land residual") method of analysis, and their assumption City would not act on a subdivision application until at least three years after the date of trial.

 In determining the sufficiency of the evidence to support a judgment, this court does not reweigh the evidence. Rather, we resolve all conflicts in favor of the prevailing party and view the evidence in the light most favorable to that party. (*Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 398 [185 Cal.Rptr. 654, 650 P.2d 1171].) We give the prevailing party the benefit of every reasonable inference from the evidence. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [122 Cal.Rptr. 79, 536 P.2d 479].) Put another way, while we examine all evidence, we will consider only the evidence supporting the successful party. (*Community Cause* v. *Boatwright* (1987) 195 Cal.App.3d 562, 569 [240 Cal.Rptr. 794].)

 With respect to the San Marcos Street properties, the evidence supports the court's finding that these properties have lower development costs, are located in a better neighborhood and have better views. In addition, there is no support for GGHI's claim that the court ignored seven other comparables. There was evidence that although the sales of these properties was for more than $100,000 per unit, each of the lots would have lower development costs than the subject property. The court's failure to discuss each comparable in its statement of decision does not mean they were ignored.

GGHI's criticism of the "land residual" method of appraisal is somewhat confusing. As GGHI states in its own opening brief, City's two appraisers

each placed primary reliance upon a "direct comparison" analysis and only employed a "land residual" analysis as a check. Moreover, as it acknowledges in its reply brief, the court's statement of decision relies exclusively upon the direct comparison analysis.

*Costs for Unreasonable Precondemnation Activities*

At trial GGHI produced the following evidence to show City had engaged in unreasonable precondemnation activity: On February 8, 1987, the City Planning Department wrote to GGHI that "[i]f the Recreation and Park Commission determines it has no interest in acquiring the property, the Planning Department is obliged to permit development of the site, subject to the Planning Code." In February of 1988, City approached GGHI concerning a possible voluntary sale of the property. Negotiations concerning a voluntary sale broke down in August of 1988, when the deputy city attorney denied knowledge of an open space designation of the property. GGHI subsequently brought an inverse condemnation action in federal court. However, the federal court dismissed the action, since GGHI had not filed a development application. GGHI subsequently filed a subdivision application. In December 1989, GGHI submitted an amended application, including photographs, Proposition M findings, an amended parcel map, and an environmental evaluation to support the application. City filed its eminent domain action 63 days later.

█ GGHI now contends that, in addition to the fair market value of the property, it is entitled to be reimbursed for its architect, engineer and consultant fees, its subdivision application fees, property taxes, mortgage carrying costs, and prejudgment interest incurred during the two-year period intervening between City's notice of formal intent to condemn[2] and the date of judgment.

A property owner is entitled to precondemnation damages where it can be demonstrated that "the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; *and* . . . as a result of such action the property in question suffered a diminution in market value." (*Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39, 52 [104 Cal.Rptr. 1, 500 P.2d 1345], fn. omitted, italics supplied; see also *Smith* v. *City and County of San Francisco* (1990) 225 Cal.App.3d 38, 46-47 [275 Cal.Rptr. 17].) Whether there has been unreasonable delay or unreasonable conduct by the condemner is a question of fact. (*Cambria Spring Co.* v. *City of Pico Rivera* (1985) 171 Cal.App.3d 1080, 1098 [217 Cal.Rptr. 772].)

---

[2]The court found this date to be November 13, 1989.

In the instant action, we need only note there is no evidence the property decreased in value as a result of City's conduct. GGHI purchased the property for $200,000; it was appraised for between $500,000 and $1,680,000.

Moreover, the facts in this case are entirely different than those alleged in *People* ex rel. *Dept. of Transportation* v. *Gardella Square* (1988) 200 Cal.App.3d 559 [246 Cal.Rptr. 139]. In that case, a partnership had purchased property for the purpose of developing a shopping center. The Department of Transportation filed a condemnation action seeking one-half of the partnership property. The partnership answered and alleged they had met all requirements for county permits and entitlements for construction except for a state encroachment permit; the department had delayed processing the encroachment permit to prevent construction of the shopping center; and as a result of this action the partnership was unable to meet loan commitments and was faced with foreclosure. The partnership alleged the precondemnation activity constituted a taking and entitled the partnership to inverse condemnation damages for loss of use of its principal. (*Id.*, at p. 564.) The Court of Appeal remanded the action for a determination of whether the partnership could prove the essential *Klopping* elements. (*People* ex rel. *Dept. of Transportation* v. *Gardella Square, supra*, at p. 574.) In contrast to the allegations in *Gardella Square*, GGHI did not file a complete subdivision application until after City had adopted a resolution to acquire the property. The record is devoid of evidence City intentionally delayed development of GGHI's property.

DISPOSITION

The judgment is affirmed.

Merrill, J., and Chin, J., concurred.

A petition for a rehearing was denied March 30, 1993, and appellant's petition for review by the Supreme Court was denied May 20, 1993.