[No. A072255. First Dist., Div. Two. Oct. 24, 1997.]

CONTRA COSTA WATER DISTRICT, Plaintiff and Respondent, v. VAQUERO FARMS, INC., Defendant and Appellant.

COUNSEL

Joseph M. Gughemetti and Frederik A. Jacobsen for Defendant and Appellant.

Andrew L. Faber, Berliner Cohen, Bold, Polisner, Maddow, Nelson & Judson, Jeffrey D. Polisner and Carl P. A. Nelson for Plaintiff and Respondent.

OPINION

RUVOLO, J.—

INTRODUCTION

In this eminent domain proceeding, Contra Costa Water District (Water District) acquired approximately 3,500 acres of 6,000 acres owned by Vaquero Farms, Inc. (Vaquero) to be used by the Water District for the Los Vaqueros Reservoir Project (Reservoir Project). The issues on appeal involve the compensation awarded Vaquero for the taking of the property. Specifically, Vaquero contends: 1) the Water District must condemn its

windpower rights, with a corresponding legal obligation to pay just compensation, even though the Water District chose to sever the property's windpower rights and reserve them to Vaquero; 2) the court erred in failing to award damages for the Water District's unreasonable precondemnation activities under *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d .1345]; and 3) the jury's award of $1 million in severance damages for the diminution in value of the property remaining in Vaquero's ownership was unsupported by the evidence.

We conclude it was permissible for the Water District to sever and reserve to Vaquero its windpower rights. We also affirm the trial court's finding that Vaquero was not entitled to recover damages for precondemnation activities, and the jury's severance damage award.

## BACKGROUND

The Vaquero property is located approximately six miles north of the City of Livermore, and approximately six miles south of the City of Brentwood. The property fronts over three miles of Vasco Road, which is a north-south traffic corridor. The 6,000 acres owned by Vaquero were and are primarily undeveloped. It varies tremendously in topographical features, ranging from relative flatlands adjacent to Vasco Road to steep ridge areas in the center and rugged ravines in the parcel's eastern portion. The property has been used as a working cattle ranch for nearly 50 years. In 1984, large portions of the ranch (over 2,100 acres) were leased for windpower electrical production and about 260 wind turbines have been installed on the property.

The Water District filed its complaint in eminent domain on June 14, 1993. By this action, the Water District sought to acquire four separate parcels of Vaquero's property, totaling approximately three thousand five hundred acres, for the Reservoir Project. The Reservoir Project is a major public work including a reservoir, diversion facilities, pumping plants, and pipelines to convey water for storage and use. It is the largest public works project ever undertaken by the Water District. The Reservoir Project's primary purposes are to improve the quality of water supplied to the Water District's customers, to minimize seasonal changes in water quality, and to improve the reliability of the Water District's supply by providing for emergency storage. The Reservoir Project's secondary purposes include providing flood control benefits, maintaining and enhancing fish and wildlife resources, and offering recreational opportunities.

Each of Vaquero's four condemned parcels will be committed to a different use in connection with the Reservoir Project's implementation:

Parcel 1—a 2,743-acre parcel to be used for reservoir and watershed purposes;

Parcel 2—a 697-acre environmental mitigation parcel outside the reservoir/watershed area to be used to mitigate the environmental effects of the Reservoir Project on the habitat of the kit fox, an endangered species, and to mitigate the Reservoir Project's effect on the wetlands;

Parcel 3—a 4.8-acre parcel at the extreme southeast corner of the property to be used for road relocation. The proposed reservoir will inundate old Vasco Road, which provides the property's only public road access. Vasco Road will be relocated to the east of the reservoir and east of the property;

Parcel 4—a 52-acre area to be used as a combination cultural resource and environmental mitigation parcel outside the reservoir/watershed area.

Vaquero did not contest the right of the Water District to take its property. Instead, the focus of its answer to the complaint was the amount of "just compensation" to which appellant was entitled. Furthermore, in response to the complaint, Vaquero sought additional compensation for alleged damages sustained as a result of the Water District's precondemnation delays and other activities, and for severance damages.

By stipulation, the parties agreed to bifurcate the proceeding and to submit the precondemnation damages claim to a court trial in advance of the trial of other issues. The only issues which proceeded to trial by jury involved the fair market value of the property taken, generally measured by the highest and best use for which it is geographically and economically adaptable (Code Civ. Proc., § 1263.320, subd. (a) [all future undesignated statutory references are to this code]; *County of San Diego* v. *Rancho Vista Del Mar, Inc.* (1993) 16 Cal.App.4th 1046, 1058 [20 Cal.Rptr.2d 675]) and an assessment of severance damages generally measured by the diminution in market value of the property remaining in the private property owner's possession (§§ 1263.410, 1263.420; *City of San Diego* v. *Neumann* (1993) 6 Cal.4th 738, 745 [25 Cal.Rptr.2d 480, 863 P.2d 725]). The presentation of evidence during the jury phase was protracted and extensive, consuming almost a month of court time. The ultimate issue of just compensation was a matter of widely conflicting expert opinion. The Water District presented witnesses who valued the property and severance damages between $6.1 million and $7.7 million. Vaquero's witnesses placed the total value of the take at over $30 million.

The jury returned a verdict in the total sum of $14,428,327. This verdict was comprised of $13,428,327 representing the fair market value of the

property taken and $1 million representing severance damages to the land remaining in Vaquero's ownership by reason of the taking. After Vaquero's motion for new trial was denied, this appeal followed.

## SEVERANCE OF WINDPOWER RIGHTS

■ Vaquero advances the proposition that the Water District could not acquire the fee interest in its property while at the same time severing the windpower rights and windpower leasehold interests and reserving them to Vaquero. ■ Before proceeding to a discussion of Vaquero's arguments, we note our rejection of the Water District's claim that Vaquero waived its right to press this issue on appeal because it withdrew funds deposited by the Water District as probable compensation. Specifically, the Water District relies on section 1255.260, which provides: "If any portion of the money deposited pursuant to this chapter is withdrawn, the receipt of any such money shall constitute a waiver by operation of law of all claims and defenses in favor of the persons receiving such payment except a claim for greater compensation."

Vaquero's arguments on this subject are presented with the express purpose of exacting from the Water District an additional incremental payment representing the value of its windpower rights. Therefore, Vaquero is making a claim for "greater compensation" which was not waived under section 1255.260 when Vaquero withdrew the deposited funds. (Cf. *San Diego Gas & Electric Co.* v. *3250 Corp.* (1988) 205 Cal.App.3d 1075, 1081-1082 [252 Cal.Rptr. 853] [condemnee's withdrawal of deposited funds waived challenge of the right to take].) ■ We proceed, then, to the merits of Vaquero's arguments.

As noted, portions of the area being acquired and portions of Vaquero's remaining property are subject to leases with various companies engaged in the enterprise of generating and selling electricity derived from wind blowing across the property. At the time of trial, over 2,100 acres of the Vaquero property were subject to windpower leases, and approximately 260 wind turbines were built on that acreage between 1984 and 1986.

In anticipation of having to place a monetary value on these windpower rights, the Water District hired a windpower consulting firm charged with estimating the value of the existing machines to their operators, valuing the undeveloped windpower leases, and valuing Vaquero's present and future rental income streams. The consultants' findings are summarized by the Water District as follows: "Unfortunately, the range of values for the present worth of the future windpower income stream was highly speculative and

varied wildly, depending on assumed long-term future energy prices, possible future royalty rates, and discount rates. It was not until 1991 that [the Water District] decided to attempt to avoid the problem entirely by reserving all windpower rights to the landowners."

The Water District's June 1993 resolution of necessity states that it is necessary to take Vaquero's fee interest but the Water District "does not, by the passage of this resolution of necessity, intend to acquire any of the windpower rights . . . ." Therefore, the Water District's complaint was limited to the acquisition of "[a]ll rights and incidents of the fee ownership interest vested in Vaquero Farms, . . . excepting and reserving to such defendants and their successors, and present and future assigns all rights for wind energy power conversion and the transmission of power generated by wind, including (1) the exclusive and perpetual right, . . . to develop, construct, install, maintain and operate windpower facilities, including but not limited to windmills, transmission lines and other facilities, necessary or advantageous for the purposes of generating or transmitting electric power from wind on the real property . . . ." The severance included reserving to Vaquero the exclusive right "to develop, construct, install, maintain and operate windpower facilities," the exclusive right to sell electric power generated by windmills, and the exclusive right to sell or lease the windpower rights. Vaquero was granted continued access to the property through nonexclusive easements for "roadway, ingress and egress, and utility purposes . . . ."

By subsequent amendment to the complaint, the Water District acquired all the windpower rights in certain areas where it was determined Vaquero's use of these rights would be inconsistent with the Reservoir Project's proposed uses. Specifically, the Water District decided to acquire Vaquero's rights in the following areas: 1) the 245-acre portion of parcel 1 that the Reservoir Project will actually flood, 2) the area within parcel 1 containing utility line relocation easements ; and, 3) all of parcel 3, the right-of-way for new Vasco Road. As a result, Vaquero's windpower rights were ultimately reserved in areas generally remaining undeveloped open space after the transfer from private to public ownership.

Vaquero filed a general demurrer to the Water District's complaint alleging it failed to state a cause of action because the Water District was prohibited, as a matter of law, from condemning the fee interest and severing the windpower rights. In opposition to the demurrer, the Water District contended that it was legally permissible to acquire the land needed for the Reservoir Project without appropriating the windpower rights because California law authorizes the condemner to sever rights it has determined are

unnecessary for the public use. The court overruled Vaquero's demurrer, allowing the Water District to acquire the fee interest in the subject property while reserving and excepting the windpower rights to Vaquero.

The question before us may be stated as follows: When a public entity acquires property through eminent domain, are the windpower rights capable of segregation or are they so affixed to the underlying land that they must be acquired by the condemning authority? While the parties' dispute presents a question of first impression, its answer can be found by applying the reasoning of well-established California eminent domain law to this neoteric factual setting.

■ Under California's condemnation statutes, ". . . any person authorized to acquire property for a particular use by eminent domain may exercise the power of eminent domain to acquire any interest in property necessary for that use . . . ." (§ 1240.110; see also §§ 1235.125, 1235.170.) The "interests" susceptible to condemnation under the statute, embrace "any right, title, or estate in property." (§ 1235.125.) Our Supreme Court has chronicled the interests considered to be property for condemnation purposes as including fee interest. (*County of San Diego* v. *Miller* (1975) 13 Cal.3d 684, 688 [119 Cal.Rptr. 491, 532 P.2d 139].) Intangible personal property, in addition to tangible property, may be taken—therefore, even a professional sports franchise is susceptible to a condemnation action. (*City of Oakland* v. *Oakland Raiders* (1982) 32 Cal.3d 60, 69-70 [32 Cal.3d 60, 183 Cal.Rptr. 673, 646 P.2d 835, 30 A.L.R.4th 1208].)

A review of the case law reveals California eminent domain law authorizes the condemner to select which right or combination of rights it needs to acquire from the full panoply of private ownership rights held within a fee simple estate. (See *Federal Oil Co.* v. *City of Culver City* (1960) 179 Cal.App.2d 93, 96-97 [3 Cal.Rptr. 519] [condemnation of lessee's surface rights without acquiring subsurface oil and gas rights]; *County Sanitation Dist.* v. *Watson Land Co.* (1993) 17 Cal.App.4th 1268, 1273 [22 Cal.Rptr.2d 117] [condemnation of permanent subterranean sewer easements and acquisition of temporary construction and occupational rights of way on the same properties]; *Unocal California Pipeline Co.* v. *Conway* (1994) 23 Cal.App.4th 331, 334 [28 Cal.Rptr.2d 429] [condemnation of subsurface easement for pipeline]; *County of Kern* v. *Galatas* (1962) 200 Cal.App.2d 353, 356 [19 Cal.Rptr. 348] [acquisition of oil, gas and mineral rights "taken separate and apart from surface rights"]; *Carlsbad etc. Co.* v. *San Luis Rey etc. Co.* (1947) 78 Cal.App.2d 900, 913 [178 P.2d 844] [condemnation of riparian rights]; *City of Oakland* v. *Nutter* (1970) 13 Cal.App.3d 752, 757 [92 Cal.Rptr. 347] [acquisition of easement in airspace above residences

close to airport to protect approaches of aircraft]; *Sacramento etc. Drainage Dist.* v. *Truslow* (1954) 125 Cal.App.2d 478, 484 [270 P.2d 928] [acquisition of right to move soil within a drainage easement without taking fee interest upheld over owner's objection]; *Sacramento etc. Dist.* v. *Pac. G.& E. Co.* (1946) 72 Cal.App.2d 638, 655-656 [165 P.2d 741] [condemnation of joint use of utility poles without taking fee interest upheld over owner's objection].) These cases remove any vestige of doubt that a condemner cannot be required to take more severable rights in property than what it needs for the public use.

When closely examined, the gravamen of Vaquero's argument rests on the premise that windpower rights must be rooted to the fee interest because no case, to date, has recognized windpower rights as capable of segregation or severance. In *Sacramento etc. Dist.* v. *Pac. G.&E. Co.*, *supra*, 72 Cal.App.2d 638, the court was confronted with a problem similar to the one presented by this case. There, a public utility sought to acquire joint use of the condemnee's utility poles by condemnation. The condemnee argued the public utility could not condemn the "mere use in the poles in question instead of the fee therein or the poles themselves." (*Id.* at p. 656.) In support of its argument, the condemnee pointed out ". . . no right or interest known to the law is being acquired by such condemnation, . . ." (*Id.* at p. 655.) The court rejected this contention, declaring "the precise legal designation which should be given to a joint use of a telegraph, telephone, or power-line pole, need not be determined herein. If the right to a joint or common use in a pole constitutes a substantial right—and we hold it does—then such a right is subject to condemnation." (*Id.* at p. 656.) In concluding the joint use of a utility pole constitutes a "substantial" right for purposes of condemnation, the court noted "[i]t is a compensable item in the acquisition of an electric distribution system. [Citation.]" which is capable of being assigned by contract. (*Id.* at p. 655.)

By parity of reasoning, windpower rights are "substantial rights" capable of being bought and sold in the marketplace, as evidenced by a 30-year lease which was entered into between Vaquero and a windpower developer, Altamont Energy Corporation, long before the Water District's condemnation action was initiated. The lease stands as irrefutable evidence that one may have a right to use windpower rights without owning any interest in the land. It memorializes Vaquero's agreement to convey the right to harness and develop windpower on its property until the year 2014 in exchange for monetary compensation, including a share of the gross annual revenue generated from the sale of electricity. Having itself derived economic benefit from the dissection of its property rights by separately leasing windpower rights to a third party, Vaquero's claim that these same rights are inextricably linked to the fee interest is unconvincing. Windpower rights clearly are

"substantial" rights and thus may be condemned, or excluded from condemnation, despite their factual novelty under present law.

Vaquero complains that as a result of this partial take, its position has changed from fee owner with full and exclusive power over the use of the property to "an uncompensated lessor of land it does not own, with the theoretical right to develop wind production on someone else's property." According to Vaquero, this change of position prevents it from exercising even limited dominion as a lessor because "wind rights are dependent on control of the surface." Vaquero suggests to the court it can no longer give its windpower lessees authority to construct new windmills or relocate old windmills on land "it no longer owns."

These arguments are based on the erroneous premise that the Water District has acquired the sole right to occupy and use the entire surface of the land for public purposes to Vaquero's exclusion. As we have detailed earlier in this opinion, the record reflects otherwise. After the condemnation proceeding Vaquero will own all windpower rights in each of the affected parcels, together with an easement for ingress and egress and such other access rights as may be required for the maintenance and development of these windpower rights. Based on our request for supplemental briefing on the compatibility of the parties' joint use of the property, we are satisfied that private windpower generation is fully compatible with the Water District's public uses for the land being taken. The parcels involved are not physically encroached by the intended body of water and instead serendipitously must remain undeveloped to meet the environmental mitigation requirements of the Reservoir Project.

Vaquero's doubts that it could carry on windpower operations without ownership of the surface rights can be quelled by a simple comparison. It is well settled that subsurface minerals, gas and oil are distinct property rights which may be conveyed separately from the fee. (*Federal Oil Co.* v. *City of Culver City, supra,* 179 Cal.App.2d at pp. 96-97; *Kennecott Corp.* v. *Union Oil Co.* (1987) 196 Cal.App.3d 1179, 1186 [242 Cal.Rptr. 403]; *Gerhard* v. *Stephens* (1968) 68 Cal.2d 864, 879 [69 Cal.Rptr. 612, 442 P.2d 692].) We agree with the Water District's assertion that "[t]he right to generate electricity from windmills harnessing the wind, and the right to sell the power so generated, is no different, either in law or common sense, from the right to pump and sell subsurface oil, or subsurface natural gas by means of wells and pumps." The Water District persuasively points out, "[T]he argument that harvesting windpower somehow requires greater usage of the surface than harvesting oil and gas resources defies common sense to anyone who has seen a field of oil derricks."

Even without the assurances of the Water District, the law implies such surface rights of possession as are necessary and convenient to exercise the right to exploit the particular profit, estate or interest reserved. (See *Callahan v. Martin* (1935) 3 Cal.2d 110, 122 [43 P.2d 788, 101 A.L.R. 871]; *Costa Mesa Union Sch. Dist.* v. *Security First Nat. Bk.* (1967) 254 Cal.App.2d 4, 11-12 [62 Cal.Rptr. 113].) Therefore, Vaquero's musing about hypothetical conflicts that could arise in the future resulting from joint possession and use of the property is unavailing. It is not our policy to resolve abstract disputes. (*Paoli* v. *California Coastal Com.* (1986) 178 Cal.App.3d 544, 554, fn. 8 [223 Cal.Rptr. 792].) If, at some point, the Water District abrogates the rights reserved to Vaquero, the law provides a remedy. ■ "A reservation of rights in lands granted or dedicated to a government agency may not be substantially impaired or destroyed by the government without payment of just compensation. [Citations.]" (*Miro* v. *Superior Court* (1970) 5 Cal.App.3d 87, 94 [84 Cal.Rptr. 874]; *Locklin* v. *City of Lafayette* (1994) 7 Cal.4th 327 [27 Cal.Rptr.2d 613, 867 P.2d 724]; *Wofford Heights Associates* v. *County of Kern* (1963) 219 Cal.App.2d 34, 41-42 [32 Cal.Rptr. 870].)

■ In conclusion, Vaquero's contention that the Water District cannot, as a matter of law, reserve windpower rights from a condemnation of property ignores the solidly established tenet of California law that a condemnation of property for public use need not be unqualified, total, and unconditional. For this reason, the authorities relied upon by Vaquero, which all involve fee simple takings without reservations, have little bearing on the issues at hand. (See *People* ex rel. *Dept. Pub. Wks.* v. *Lynbar, Inc.* (1967) 253 Cal.App.2d 870 [62 Cal.Rptr. 320]; *Peter Kiewit Sons' Co.* v. *Richmond Redevelopment Agency* (1986) 178 Cal.App.3d 435 [223 Cal.Rptr. 728].)

### IMPROPER PRECONDEMNATION CONDUCT

■ Notwithstanding the trial court's conclusion that no precondemnation liability was proven under *Klopping* v. *City of Whittier, supra,* 8 Cal.3d 39 (*Klopping*), Vaquero claims the Water District's precondemnation activities entitle it to damages. ■ In *Klopping,* our Supreme Court announced that a condemner could be held liable for damages for the adverse economic impact on private property resulting from precondemnation delay and/or unreasonable conduct. (*Id.* at pp. 51-52.) The court determined: "[W]hen the condemnor acts unreasonably in issuing precondemnation statements, either by excessively delaying eminent domain action or by other oppressive conduct, our constitutional concern over property rights requires that the owner be compensated. This requirement applies even though the activities which give rise to such damages may be significantly less than those which would constitute a de facto taking of the property so as to measure the fair

market value as of a date earlier than that set statutorily. . . ." (*Ibid.*) In order to demonstrate entitlement to damages for unreasonable precondemnation conduct, ". . . a condemnee must be provided with an opportunity to demonstrate that (1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and (2) as a result of such action the property in question suffered a diminution in market value." (*Id.* at p. 52, fn. omitted.)

As we have noted, the trial was bifurcated, with the first phase limited to a court trial on the narrow issue of whether the Water District engaged in improper precondemnation conduct entitling Vaquero to damages under *Klopping*. (See *Redevelopment Agency* v. *Contra Costa Theatre, Inc.* (1982) 135 Cal.App.3d 73, 79-80 [185 Cal.Rptr. 159].) The trial court heard evidence for five days. Vaquero sought to prove that the fair market value of its property was diminished because of the Water District's unreasonable conduct and delays occurring after adoption of an environmental impact report in 1986 which showed its property as part of the proposed Reservoir Project. Specifically, Vaquero alleged that it was unable to develop a portion of its property for residential use and it suffered a loss of the anticipated profits and higher land values which would inevitably follow. Vaquero argued, "For seven years, [the Water District] placed a cloud over Vaquero's property, while publicly announcing its intention to destroy access and flood the subject property. During this delay, [the Water District] acquired all of Vaquero's major neighbors, rendering it an island of private ownership, threatened to stop any proposed development in the project area, and let Vaquero hang in limbo without ever once proceeding with expeditious negotiation mandated by Government Code [section] 7267.1. Its precondemnation conduct, vis-à-vis Vaquero, was unreasonable."

The Water District's evidence revealed that it was engaged in a project of immense proportions, totaling roughly the square mileage of San Francisco, requiring acquisition of property from many separate ownerships and obtaining numerous permits and approvals legally required to implement such a project. Water District personnel testified that the acquisition of Vaquero's property was the most difficult and complex property acquisition for the entire project. For example, until mid-1990 the size and configuration of the property required from Vaquero was unknown. The Water District insisted it expeditiously sought to negotiate with Vaquero after the Water District determined the location, exact size, and configuration of the property needed from Vaquero and after it obtained the necessary environmental approvals for the relocation of Vasco Road and approval of specific access to serve Vaquero's remaining property. The Water District contended that if there

was "delay" the delay was reasonable and prudent conduct, given the unique uncertainties and problems that the acquisition of Vaquero's property posed and that it would have been "foolhardy and rash" to have acquired the property earlier.

The court issued a 25-page statement of decision reflecting a conscientious effort to parse complicated and extensive evidence. It contains the following ultimate finding: *"There was neither an unreasonable delay following the resolution of intention to condemn, nor unreasonable conduct, nor unreasonable delay prior to condemnation.* Further the court found no damages by loss in market value attributable to any actions of the [Water District]; . . ." (Original italics.) The court, in effect, found Vaquero had failed to prove any of the essential *Klopping* components—unreasonable delay, unreasonable conduct, and diminution in market value—which would entitle Vaquero to precondemnation damages.

■ Whether there has been unreasonable delay by the condemner and whether the condemner has engaged in unreasonable conduct are both questions of fact. (*Klopping*, *supra*, 8 Cal.3d at p. 55; *City and County of San Francisco* v. *Golden Gate Heights Investments* (1993) 14 Cal.App.4th 1203, 1212 [18 Cal.Rptr.2d 467].) What constitutes a direct and substantial impairment of property rights for purposes of compensation is also a factual question. (*State of California* v. *Meyer* (1985) 174 Cal.App.3d 1061, 1072 [220 Cal.Rptr. 884]; *City of Los Angeles* v. *Waller* (1979) 90 Cal.App.3d 766, 778 [154 Cal.Rptr. 12].) In deciding factual matters on conflicting testimony and inferences, it is for the trier of fact to determine which evidence and inferences it finds more reasonable. (See *People* ex rel. *Dept. of Transportation* v. *Diversified Properties Co. III* (1993) 14 Cal.App.4th 429, 441 [17 Cal.Rptr.2d 676]; *Cambria Spring Co.* v. *City of Pico Rivera* (1985) 171 Cal.App.3d 1080, 1098 [217 Cal.Rptr. 772].)

■ Vaquero has filed an extensive brief in which it allegedly does not question the sufficiency of the evidence to support the trial court's findings but contends that the court made certain errors of law which unfairly dictated an erroneous result. Although Vaquero's arguments are directed toward alleged legal errors in the court's analysis, when closely examined, they merely reflect disagreement with how the court resolved conflicts in the evidence.

The first alleged "legal error" is assigned to the court's selection of June 1993 as the commencement date under *Klopping* for assessing the reasonableness of any delay in pursuing the "take." The record reflects that on June 9, 1993, the Water District's board of directors passed a "resolution of

necessity," a necessary precursor before formal condemnation proceedings can be initiated (§ 1240.030). The Water District filed this eminent domain action on June 14, 1993.

The court's selection of June 1993 was significant because in order to evaluate whether the condemner has unreasonably delayed initiating condemnation proceedings, the finder of fact must establish at what point the governmental entity's planning activities converted into acquisition activities. As explained by the court in *Terminals Equipment Co.* v. *City and County of San Francisco* (1990) 221 Cal.App.3d 234 [270 Cal.Rptr. 329]: "[T]here must have been either some formal announcement by the condemning agency of its intention to condemn, or some other official act or expression of intent to acquire the property in question. . . . [¶] [W]here there has been no 'official action amounting to an announcement of intent to condemn, there could be no liability based upon unreasonable delay following such announcement.' [Citation.] The pivotal issue in every case is whether the public agency's activities have gone beyond the planning stage to reach the 'acquiring stage.' " (*Id.* at pp. 245-246.) As the court in *State of California* v. *Meyer*, *supra*, 174 Cal.App.3d 1061, put it: "[T]he only delay relevant for damages in inverse condemnation [under *Klopping*] is delay after announcement of intention to condemn. [Citation.]" (*Id.* at p. 1072.)

The trial court correctly noted that the property owners in *Klopping* were found to have met the official action requirement by showing the governmental entity had issued a formal resolution expressing its intention to acquire plaintiffs' property. Armed with that knowledge the court here similarly found: "The 'announcement of intent to condemn' as defined in *Klopping*, to wit, a formal resolution to proceed to eminent domain action, was adopted by [the Water District] in this case in June, 1993."

Vaquero insists the trial court's "reliance on a formal resolution of condemnation to trigger a *Klopping* violation is pure error." In arguing the court erred, Vaquero relies upon *People* ex rel. *Dept. Pub. Wks.* v. *Peninsula Enterprises, Inc.* (1979) 91 Cal.App.3d 332 [153 Cal.Rptr. 895] (*Peninsula Enterprises*) which held that a direct and special interference with an owner's property can create precondemnation liability and entitlement to damages even without a formal resolution of condemnation. (*Id.* at p. 356.) The rule announced in *Peninsula Enterprises* arose from a factual situation in which the condemnor's activities evidenced its irreversible intent to acquire the property for a proposed freeway project while resulting in a substantial interference with the owner's property rights. After making several rebuffed offers to purchase the property, the condemning authority engaged in a course of conduct designed to thwart the owner's efforts to develop the

property. (*Id.* at p. 342.) Thus, notwithstanding the absence of a formal resolution of condemnation, the "condemnor's activities had reached the acquiring rather than planning stage . . . ." (*Id.* at p. 356.) Based upon that finding the court agreed that a freeway agreement entered into between the condemnor and the property owner should "be treated as the type of precondemnation announcement resulting in direct and special interference with private property with which the court in *Klopping* was concerned." (*Ibid.*)

In several post-*Peninsula Enterprises* decisions, official action constituting an intent to condemn without a formal resolution has been found where the condemner unduly delayed acquisition proceedings or engaged in other unreasonable conduct which significantly invaded or appropriated the use or enjoyment of private property. (See *Tilem* v. *City of Los Angeles* (1983) 142 Cal.App.3d 694, 708-709 [191 Cal.Rptr. 229] [city's precondemnation activities took owner's ability to use his land for a substantial period of time]; *Taper* v. *City of Long Beach* (1982) 129 Cal.App.3d 590, 615 [181 Cal.Rptr. 169] [condemner unreasonably dragged out negotiations and progressively reduced its offers, while at the same time not permitting owners to develop and utilize the property].)

It is significant to note, however, that the *Peninsula Enterprises* doctrine has been invoked sparingly to remedy the most egregious examples of official overreaching. It has been expressly found inapplicable to those situations where the condemning authority "has not acted unreasonably or capriciously, and has followed orderly procedures, . . ." (*Cambria Spring Co.* v. *City of Pico Rivera, supra,* 171 Cal.App.3d at p. 1093.) In our opinion, such judicial parsimony is warranted. While the reasoning of *Peninsula Enterprises* has become part of the fabric of California's eminent domain law, it undeniably broadens the concept of compensable injury under *Klopping* to encompass damages arising prior to any official announcement of condemnation. As such, its indiscriminate application risks either inhibiting legitimate preacquisition activities or promoting ill-advised precipitous condemnation action by officials concerned about exposure to additional claims of compensation.

It cannot be said as a matter of law that this dispute is one of the exceptional cases where justice requires the invocation of the doctrine announced in *Peninsula Enterprises*. The trial court's final statement of decision properly recognized the critical difference between acceptable planning activities and unacceptable acquisition activities which significantly interfere with the landowner's interest, finding: "[T]he continuing activities of [the Water District], although lasting beyond their original time table, and although not involving direct communication with the representatives of

[Vaquero], were directly aimed at further defining the amount of the necessary take from all the parcels involved, the necessary relocation of Vasco Road, meeting environmental concerns, confronting the many issues raised by the agencies whose permits were required, and seeking financing and other potential partnership arrangements." The court also noted, "As of the time of this trial, the entire project had still not received all of the final permits and approvals necessary from all of the various agencies involved." The findings conclude by emphasizing Vaquero's interest and permissible use of its property had not in any way been changed or reduced by the Water District's precondemnation activities. In applying *Peninsula Enterprises,* the court expressly found "neither direct intentional interference" with the exercise of any of Vaquero's property rights nor conduct "aimed at and/or impinging on the value of the land, short of those acknowledged and permitted" by the case law.

Therefore, the court properly evaluated whether the Water District's planning activities resulted in the sort of "special and direct interference" with Vaquero's property which would be legally tantamount to an announced intention to condemn for purposes of establishing delay-based *Klopping* damages. The court's rejection of this claim was supported by substantial evidence and was in complete conformance with cases finding on similar facts the condemnor's activities never went beyond the planning stage and did not reach the level of acquisition. (See *Cambria Spring Co.* v. *City of Pico Rivera, supra,* 171 Cal.App.3d at pp. 1097-1098 [recordation of redevelopment plan, sale of bonds and application for federal grant did not amount to announcement of intent to condemn]; *Smith* v. *State of California* (1975) 50 Cal.App.3d 529, 535-536 [123 Cal.Rptr. 745] [official actions necessarily preceding condemnation process are not equivalent to an announcement of intent to condemn]; *Guinnane* v. *City and County of San Francisco* (1987) 197 Cal.App.3d 862, 866-867 [241 Cal.Rptr. 787] [designation of plaintiff's property as site for possible acquisition not functional equivalent of an announced intent to condemn]; *Terminals Equipment Co.* v. *City and County of San Francisco, supra,* 221 Cal.App.3d at p. 246 [informal representations of intent to acquire property did not constitute official intent to condemn].)

As another assignment of legal error, Vaquero claims the trial court's statement of decision relies too heavily upon the factual justifications for the Water District's delay and pays too little attention to the impact of these delays on the property owner. Thus, Vaquero contends the court applied an incorrect standard of proof in evaluating its claims citing *Tilem* v. *City of Los Angeles, supra,* 142 Cal.App.3d 694, where the court stated, "The question in eminent domain proceedings therefore is not what the taker has gained, but

what the owner has lost." (*Id.* at p. 702.) But this passage in *Tilem* relates to the legal measure of just compensation and has no bearing on assessing liability for unreasonable conduct during precondemnation activities under *Klopping.* (See *Housley* v. *City of Poway* (1993) 20 Cal.App.4th 801, 807 [24 Cal.Rptr.2d 554].) To the contrary, because the legal test for liability turned on Vaquero's ability to prove that the Water District unreasonably delayed following the condemnation announcement, the key factual inquiry necessarily involved assessing the bona fides of the Water District's justifications for its actions.

As Vaquero's final assignment of "legal error," it challenges the trial court's conclusion Vaquero had not suffered any legally cognizable damages due to the Water District's precondemnation conduct. Once again, the evidence on this point was highly conflicting. Vaquero attempted to prove the Water District made a calculated decision to interfere with the subdivision potential of its property in order to freeze the property's value pending acquisition. The court instead concluded that the initial timetables were "overly optimistic."

The cases which have found legally cognizable damages under *Klopping* are generally ones in which the condemning authorities have acted affirmatively to lower the value of the subject property, physically burdened the property, and/or decreased the income the property produced. (See, e.g., *Jones* v. *People* ex rel. *Dept. of Transportation* (1978) 22 Cal.3d 144, 151 [148 Cal.Rptr. 640, 583 P.2d 165] [property owners entitled to precondemnation damages because state denied them necessary access to their land in connection with pending freeway project]; *Tilem* v. *City of Los Angeles, supra,* 142 Cal.App.3d at pp. 704-705 [city's inadequate offer of compensation coupled with the possibility of an assessment for the street project definitely affected property's marketability]; *Stone* v. *City of Los Angeles* (1975) 51 Cal.App.3d 987, 993-994 [124 Cal.Rptr. 822] [lost rental value properly awarded for unreasonable delay].)

The trial court found the evidence in this case disclosed no such actions. Specifically, the court found "no damages by loss in market value attributable to any actions of [the Water District]; further there appear to be no lost rentals or other income, since [Vaquero] continued its farming operations and enhanced its other income by the wind power contracts; . . . ." The claimed loss of potential subdivision development profits was dismissed by the trial court as "purely speculative because [Vaquero] decided not to go ahead." The court also pointed out that despite Vaquero's contention that the area was " 'ripe for development' " because of subdivision approvals granted neighboring property owners, "there had been no lot sales in these areas because of the conditions required by the permits."

Furthermore, Vaquero misunderstands the reach of *Klopping* in arguing the trial court erred by placing undue emphasis on the existing uses of its property and rejecting Vaquero's evidence that the Water District's activities impaired the residential development potential of a portion of the property. Additional precondemnation damages under *Klopping* are only for temporary damage actually suffered during the period of unreasonable delay. To award more based on lost potential would render to the property owner a duplicate recovery when the owner is also awarded the fair market value based on the highest and best use of the property taken in the condemnation action. (See *People* ex rel. *Dept. of Transportation* v. *Diversified Properties Co. III, supra*, 14 Cal.App.4th at p. 446; *City of Los Angeles* v. *Monahan* (1976) 55 Cal.App.3d 846, 852, fn. 7 [127 Cal.Rptr. 763].) Moreover, there is no recovery via *Klopping* for uses and injuries that are only speculative, conjectural, or remote—as one court colorfully put it, for the taking of a "pipe dream." (*City of Los Angeles* v. *Lowensohn* (1976) 54 Cal.App.3d 625, 636 [127 Cal.Rptr. 417]; see generally, *City of San Diego* v. *Neumann, supra*, 6 Cal.4th at pp. 747-748; *State of California* v. *Meyer, supra*, 174 Cal.App.3d at p. 1071.)

At all times during the Water District's alleged unreasonable activities, Vaquero continued to use the property for cattle ranching and for windpower electrical production. The profitability of these uses remained undiminished during this period. Vaquero conceded during pretrial discovery that the Water District did not interfere with any of the existing uses of its land. (*City of Los Angeles* v. *Property Owners* (1982) 138 Cal.App.3d 114, 120-121 [187 Cal.Rptr. 667] [trial court erred in awarding *Klopping* damages where absence of proof city's delays affected property's use or market value]; *City of Los Angeles* v. *Waller, supra*, 90 Cal.App.3d at pp. 779-780 [where vacant land simply remained in that condition until condemnation no damages incurred]; *City and County of San Francisco* v. *Golden Gate Heights Investments, supra*, 14 Cal.App.4th at pp. 1212-1213 [*Klopping* liability denied when there was no evidence property decreased in value as a result of City's conduct].)

There is no evidence Vaquero ever took any preparatory steps toward developing the property for residential use or selling it to a developer for that purpose. No development applications, proposals, plans or permits were ever prepared or filed with the County of Contra Costa or any other governmental agency. Vaquero never attempted to change the property's zoning from agricultural to residential. Although Vaquero's witnesses insisted none of these steps were taken because the Water District's precondemnation statements and activities made residential development futile, we believe the court was entitled to disregard such assertions, especially considering the

fact, highlighted in the court's findings, that there had been no lots sold in the vicinity of defendant's property "because of the conditions required by the permits."

Therefore, there was substantial evidence to support the conclusion that the particular scheme to develop the property existed only in Vaquero's contemplation and that the opportunity to reap profits from residential development was not lost because of anything the Water District did or did not do. (See *Jones* v. *City of Los Angeles* (1979) 88 Cal.App.3d 965, 973 [152 Cal.Rptr. 256] [trial court's finding condemnor did not interfere with development of land supported by substantial evidence and upheld]; *City of Los Angeles* v. *Lowensohn, supra,* 54 Cal.App.3d at p. 636 [no precondemnation damages shown where land remained vacant, no utilities had been attached, and no improvements undertaken on the property in anticipation of industrial use].)

In conclusion, we reject Vaquero's argument that the trial court's findings denying a recovery of damages under *Klopping* demonstrate fatal defects in the court's reasoning. To the contrary, the court's factual findings were fully supported by the evidence and guided by legal principles and policies entirely appropriate to precondemnation liability cases as explained in *Klopping* and its progeny.

### SEVERANCE DAMAGES

■ As noted, the fair market value for the property was fixed by the jury at $13,428,327. We need not refer to it further, as this amount is not challenged on appeal. Vaquero challenges the jury's award of $1 million in severance damages for the diminution in value of the approximately 2,500 acres remaining in its possession. Vaquero claims this amount "was inadequate because there was no basis of any kind in the evidence for such a low award."

■ When a condemnation action severs the land by taking only a part of it, the owner may be entitled to an additional sum as compensation for the economic effect of the condemnation on the value of the remaining property. (§ 1263.410, subd. (a).) Severance damages are measured by the difference in value of the remaining portion of the property before and after the taking. (*City of San Diego* v. *Neumann, supra,* 6 Cal.4th at pp. 738, 745; *City of Hollister* v. *McCullough* (1994) 26 Cal.App.4th 289 [31 Cal.Rptr.2d 415].)

■ Here, witnesses for both Vaquero and the Water District testified to specific dollar amounts of severance damage. The Water District's experts

testified that the severance damages awarded in this case reflected the costs attributable to improving the property's accessibility after Vasco Road's relocation. They also testified that the severance damage for this type of loss ranged from $500,000 to $600,000. Vaquero's experts asserted a completely different theory. They claimed severance damages should be assessed based on the lost potential of the remaining property for use as a landfill site. Vaquero's witnesses testified the eastern portion of Vaquero's property was eminently suitable for a landfill but the landfill potential was lost because of the property's proximity to the Reservoir Project and the possibility of groundwater contamination. Vaquero's witnesses testified that the severance damage for the loss of landfill potential ranged from $12.7 million to $16.1 million.

The trial court properly instructed the jury they could not return a verdict lesser or greater than the value shown by the testimony of the witnesses. (BAJI No. 11.80) Thus, evidence of severance damages ranged from $500,000 to $16.1 million. The record does not reveal how the jury arrived at $1 million.

Vaquero argues the jury's award of severance damages is "inadequate and not supported by credible evidence." Vaquero's characterization of the award as "inadequate," indicates the unbelievability of the Water District's witnesses and the proficiency of its own witnesses. We will not reweigh the evidence nor judge the credibility of witnesses. Vaquero's argument the jury's award is "not supported by the credible evidence" is predicated on the assumption that the jury was bound to award an amount only within the two ranges of valuation. In effect, Vaquero argues the jury is prohibited from assessing damages anywhere in the middle of the two opposing theories because such an amount cannot be tied to the valuation testimony of any witness.

In *City of Pleasant Hill* v. *First Baptist Church* (1969) 1 Cal.App.3d 384 [82 Cal.Rptr. 1], the court analyzed a similar argument and upheld the jury's award for severance damage even though there was no testimony relating to the figure returned and no formula suggested which would produce it. As in this case, it was argued the jury impermissibly " ' "cut somewhere in between" ' " the divergent amounts presented by each side. (*Id.* at p. 408.) The court rejected this argument: " 'The differences among these factors presented conflicts in the evidence; these were for the jury to resolve . . . . The range limiting its severance-damage figure ran up to the highest valid arithmetical combination of factors selected from the testimony of all the witnesses; any verdict less than such highest possible figure was—as this one was—"shown by the testimony of the witnesses" . . . and, hence,

supported by the evidence.' " (*Id.* at p. 409.) Other courts have recognized it is within the province of the trier of fact to reconcile conflicting testimony when presented with wide discrepancies in the estimates of value and damage by witnesses for each side. (See *San Diego Metropolitan Transit Development Bd.* v. *Cushman* (1997) 53 Cal.App.4th 918, 930-931 [62 Cal.Rptr.2d 121]; *People* v. *Thompson* (1954) 43 Cal.2d 13, 27-28 [271 P.2d 507].) With the evidence in this state, the trier of fact "may reasonably have deemed unrealistic various factors" upon which the witnesses based their respective valuations. (*People* ex rel. *Dept. of Public Works* v. *Pera* (1961) 190 Cal.App.2d 497, 501 [12 Cal.Rptr. 129].) Vaquero has provided no reason to depart from the reasoning of these cases, and we see no reason to overturn the jury's verdict.

DISPOSITION

The judgment is affirmed.

Haerle, Acting P. J., and Lambden, J., concurred.